[Civ. No. 19559.    First Dist., Div. One.    July 26, 1961.]

WALLACE J. VALENTINE et al., Respondents, v. KAISER FOUNDATION HOSPITALS et al., Appellants.

Carlson, Collins, Gordon & Bold, Robert Collins, Richard G. Logan, Bledsoe, Smith, Cathcart, Johnson & Phelps and Robert A. Seligson for Appellants.

William E. Ferriter for Respondents.

DUNIWAY, J.—This is another appeal in which the principal ground urged is that the court gave a res ipsa loquitur instruction that took from the jury the question as to whether the essential elements upon which the applicability of the doctrine is predicated had been proved by the plaintiffs. Other errors in instructing the jury are also claimed. We have concluded that there was error, but that under the peculiar facts of the case the error was not so prejudicial as to require a reversal.

## I. *Res Ipsa Loquitur.*

The action is for medical malpractice, and is based upon the fact that the minor plaintiff, who was at the time but 2 days old, lost his *glans penis* as the result of a circumcision. No claim is made that the evidence does not support the verdict, nor is it claimed that the case is not one in which a proper res ipsa loquitur instruction should have been given. The objection is solely to the form in which the instruction was cast.

At plaintiffs' request, the court gave this instruction:

"You ladies and gentlemen are instructed that the general rule of law is that the mere happening of the accident, of and by itself, as set forth in plaintiff's complaint, or the mere fact that plaintiff brought this action of and by itself or that plaintiff suffered injuries of and by itself, do not of itself or themselves raise any presumption or inference against any of the defendants.

"From the happening of all the events involved in this case, however, as established by the evidence, there arises an inference that the proximate cause of the occurrence or accident was some negligent conduct on the part of the defendants. This inference is brought about by what is known in law as the res ipsa loquitur doctrine. That inference is, however, a form of evidence, and if there is none other tending to overthrow it, or if the inference preponderates over contrary evidence, it will support a verdict for plaintiff. Therefore, you should weigh any evidence tending to overcome that inference, bearing in mind that it is incumbent upon the defendants to rebut the inference by showing that it or he did, in fact, exercise the care and diligence required of them, or that the occurrence or accident occurred without being caused by any failure of duty on their part.

"In making such a showing, it is not necessary for the defendants to overcome the inference by a preponderance of the evidence. Plaintiff's burden of proving negligence by a preponderance of the evidence is not changed by the rule just mentioned. It follows, therefore, that in order to hold the defendants liable, the inference of negligence must have greater weight, more convincing force in the mind of the jury, than the opposing explanation offered by the defendants. If such a preponderance in plaintiff's favor exists, then it must be found that some negligent conduct on the part of the defendants was a proximate cause of the injury; but if it does not exist, if the evidence preponderates in defendant's favor, or if in the jury's mind there is an even balance as between the weight of the inference and the weight of the contrary explanation, neither having the more convincing force, then your verdict must be for the defendants.

"This instruction may appear to constitute an exception to the general rule that the mere happening of an accident, or the mere fact that plaintiff suffered injuries, or the mere fact that

plaintiff brought this action, does not support an inference of negligence. This instruction, however, is based on a special doctrine of law which is to be applied under the evidence in this case.''

As "defensive" instructions, proposed only if the court decided to instruct on res ipsa loquitur, the following instructions, suggested by appellants, were given:

"If you find from the evidence in this case that defendants have presented evidence which shows a satisfactory explanation of the injury, that is, a definite case [*sic*—cause] for the injury, in which there is no negligence on the part of the defendants, then I instruct you that the inference of negligence has been dispelled and you should not infer negligence from the happening of the injury in this case.''

"If you find from the evidence in this case that defendants have presented evidence which establishes to your satisfaction that defendants exercised such care as leads to the conclusion that the injury did not happen because of a want of ordinary care, but was due to some cause, although the exact cause may be unknown, then I instruct you that the inference of negligence has been dispelled, and you should not infer negligence from the happening of the injury in this case.''

Basically, appellants' position is that error was committed because the court told the jury that an inference of negligence of the defendants arises " [f]rom the happening of all the events involved in this case . . . as established by the evidence. . . .'' They say that the evidence includes testimony which, if believed by the jury, would negative two of the three grounds upon which the doctrine of res ipsa loquitur rests and that, under these circumstances, the court should have defined the doctrine and the factual bases that are required to sustain it, and left it to the jury to determine whether those bases had been established, instructing it to apply the doctrine only if it found that those bases were established. They suggest that an instruction like B.A.J.I. 206A (revised) should have been given. They rely upon such cases as *Seneris* v. *Haas*, 45 Cal.2d 811, 823 [291 P.2d 915, 53 A.L.R.2d 124]: "the jury . . . should have been permitted to determine whether each of the conditions necessary to bring into play the rule of res ipsa loquitur were present"; *Wolfsmith* v. *Marsh*, 51 Cal.2d 832, 836 [337 P.2d 70]; *Roberts* v. *Bank of America*, 97 Cal.App.2d 133, 137 [217 P.2d 129]; *Milias* v. *Wheeler Hospital*, 109 Cal.App.2d 759, 762-764 [241

P.2d 684] and particularly *Salgo* v. *Leland Stanford etc. Board of Trustees,* 154 Cal.App.2d 560, 572 [317 P.2d 170]. These cases do sustain appellants' position, as do the following, each of which criticizes an instruction like the one given in this case, which is like old B.A.J.I. 206-B, 206-D, and the first paragraph of 206-C: *Kite* v. *Coastal Oil Co.,* 162 Cal.App. 2d 336, 344-345 [328 P.2d 45]; *Rayner* v. *Ramirez,* 159 Cal. App.2d 372, 380-381 [324 P.2d 83]; *Black* v. *Partridge,* 115 Cal.App.2d 639, 647-650 [252 P.2d 760]; *Fry* v. *Sheedy,* 143 Cal.App.2d 615, 626 [300 P.2d 242]; *Hardin* v. *San Jose City Lines, Inc.,* 41 Cal.2d 432, 435-436 [260 P.2d 63]; *Gordon* v. *Aztec Brewing Co.,* 33 Cal.2d 514, 518-520 [203 P.2d 522].

It will be noted that the instructions given nowhere state the conditions necessary to bring the doctrine into play, as do old B.A.J.I. 206-C and revised B.A.J.I. 206-A ██ Those conditions are well established, and were recently stated by the Supreme Court as follows: "The conditions requisite for the application of the doctrine of res ipsa loquitur are: (a) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (b) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (c) it must not have been due to any voluntary action or contribution on the part of the plaintiff." (*Wolfsmith* v. *Marsh, supra,* 51 Cal.2d 832, 835.)

Appellants correctly contend that there is evidence in this case from which, if permitted by the instructions to do so, the jury could have found that condition (b) was not shown. They make the same contention as to condition (a), but, we think far less effectively.

The operation was performed by Dr. Bloom, and thereafter the child, Kevin, was examined by several other doctors.

There was clearly sufficient evidence to justify the giving of "an" instruction on res ipsa loquitur. Condition (a) was supported by Dr. Bloom's testimony that the result was so unusual that it was the only one of which he had ever heard; it was likewise sustained by Dr. McCune's testimony that in 30 years of medical practice during which he indirectly witnessed thousands of circumcisions, he had only heard of two cases (and only one in which, as in this case, a Gomko clamp had been used) which had resulted in damage to the glans and that that case involved "a wide breach of practice and judgment." We think, too, that the jury could apply common

knowledge, that in circumcision, one of the most ancient and widely performed operations in human history, loss of the glans (the tip or head of the penis) does not ordinarily occur in the absence of someone's negligence. (*Cf. Cavero* v. *Franklin etc. Benevolent Soc.,* 36 Cal.2d 301, 308-311 [223 P.2d 471]; *Ybarra* v. *Spangard,* 25 Cal.2d 486, 491 [154 P.2d 687, 162 A.L.R. 1258]; *Brown* v. *Shortlidge,* 98 Cal.App. 352, 355 [277 P. 134]; *Bauer* v. *Otis,* 133 Cal.App.2d 439, 444-445 [284 P.2d 133] and cases there cited; *Ales* v. *Ryan,* 8 Cal.2d 82, 95-99 [64 P.2d 409].)

Condition (b) was supported by Dr. Bloom's testimony that all the instruments used in the operation were in his possession, when coupled with Dr. Santomieri's testimony that the condition of Kevin's penis was the end result of a " 'Previous operative procedure' " and his testimony that in using those words he was referring to the circumcision.

Condition (c) need not be discussed; there is no claim that there is a conflict in the evidence as to it.

There was, however, evidence which showed that Kevin's loss was caused by an infection occurring after he left the hospital, and which had so far progressed by the time he was returned there that it could not then be cured. Appellants rely upon portions of the testimony of four different doctors. One of them, Dr. Weyrauch, a fully qualified expert, who examined the child and was given a full history of the case, testified that in his opinion the injury "was not caused by the operative incision," that it was caused by an infection, that the condition was not gangrenous when the child left the hospital, that the infection set in after the child went home and that by the time the child was brought back to the hospital, it was too late to prevent the result that occurred. The testimony of the other doctors is less positive and less detailed, but does lend some support to these views.

In a brief of 103 pages, counsel for respondents devotes many pages to an attack upon Dr. Weyrauch and his testimony. However, the record shows that he was fully qualified, and he gave detailed reasons for his opinions that certainly cannot be said to be insufficient as a matter of law. Counsel's argument would be appropriate before a jury; it is out of place before this court.

We think that, if the instruction given at respondents' request were the only one given, the judgment might have to be reversed under the ruling of this court in *Salgo, supra.*

But, as we have seen, there were two additional instructions given at appellants' request. Respondents urge that these "cured" the error, if any.

In determining the effect of these instructions, the nature of appellants' contention must be kept in mind. Appellants' only basis for claiming that the initial res ipsa instruction was erroneous is (a) that there was evidence which if believed would explain the injury, (b) that the explanation would involve no negligence on appellants' part, and (c) that the presumption would never arise if the evidentiary conflict were resolved in their favor. The first of the appellants' two instructions tells the jury that they are not to infer negligence from the happening of the injury if they believe appellants' explanation thereof. In short, it would seem that the "sin" of the originally given res ipsa instruction was that it took from the jury a factual determination which rightfully should have been left with them; the first of the appellants' instructions, however, would appear to give back to the jury that determination. The second of appellants' instructions has a similar effect.

In this context it should be noted that while appellants' contention with regard to the original res ipsa instruction is a legally valid one, it is somewhat technical in nature. The distinction between evidence rebutting a presumption that has arisen and the same evidence causing the presumption not to arise in the first place, is a fine one even to the legally trained ear; it in all likelihood is even finer to the ear of one not trained in the law. It is certainly questionable whether a layman (or for that matter a lawyer) is capable of finding that the same evidence which fails to rebut a presumption under an improper res ipsa instruction would have kept it from arising under a proper one. In short, even if a proper instruction had been given, the jury would still have made the same factual determination in a different context. Since the determination was put back into its "proper" context by the latter two instructions, we do not think that the case should be reversed on the basis of appellants' contention. As we have said, on the basis of the *Salgo* case, the court should not have given the initial res ipsa instruction that it gave. It goes one step further, however, to hold that the jury was so misled by that instruction that the defect was not cured by the two instructions requested by appellants.

In this case, respondents' proof was very strong—almost overwhelming. Under these circumstances, we cannot find that the instruction was prejudicially erroneous.

Appellants' principal reliance is on *Salgo, supra,* but the facts in that case were very different; as we there pointed out, the medical procedure there in question was "a relatively new diagnostic procedure, . . . not a matter of common knowledge among laymen" (154 Cal.App.2d at p. 570), and no medical witness testified that the paraplegia there involved would not occur without negligence (p. 571). Under such circumstances, it was of the utmost importance that the jury be properly and fully instructed as to its function in determining whether the conditions precedent to the application of res ipsa loquitur had been established; it seemed quite probable that, if so instructed, they would have found against the plaintiff on this issue. Not so here; we think that in this case the probabilities are all the other way.

We would have more sympathy for appellants' position if they had themselves presented to the court below a correct instruction, as was done in *Fry* v. *Sheedy, supra,* 143 Cal.App. 2d 615, 625-626. We are aware, of course, that "giving an instruction, although no objection to such instruction was made," is "deemed to have been excepted to" (Code Civ. Proc., § 647), and that it has repeatedly been held that a defendant has no duty to propose instructions upon the plaintiff's theory of the case. (See *Hensley* v. *Harris, supra,* 151 Cal.App.2d 821 [312 P.2d 414], in which the matter is reviewed by Mr. Presiding Justice Shinn.) As is there stated, "Perhaps it would be better practice to require specific objections to the instructions proposed by one's adversary, but that is not our law nor is it a matter for judicial legislation." (Pp. 826-827.)

Here, however, the situation is somewhat different. We must presume that each side delivered to the judge, and served upon opposing counsel, their proposed instructions, before the first witness was sworn. (Code Civ. Proc., § 607a.) Both sides proposed instruction upon res ipsa loquitur—appellants' being proposed conditionally, to be given only if the court decided to instruct upon the subject. This action of appellants does not of itself constitute invited error; Code of Civil Procedure, section 647, still preserved appellants right to claim error if the court did instruct upon that subject. (See *Masterson* v. *Pig'n Whistle Corp.,* 161 Cal.App.2d 323, 336

[326 P.2d 918]; *Williamson* v. *Pacific Greyhound Lines,* 93 Cal.App.2d 484, 487-488 [209 P.2d 146].) The rule can perhaps be justified upon the ground that for many years the practice in this state has been such that counsel had no way of knowing what instructions the court would give until he found out by hearing the actual charge to the jury. At that point, objections, argument, suggestions as to corrections, and actual corrections would be difficult and time consuming to all concerned, and, in all probability, most confusing to the jury.

However, in 1957 the Legislature amended section 607a of the Code of Civil Procedure, and counsel now has the right, before the commencement of oral argument, to be told by the court what instructions will be given. Here it was plain to both sides from the outset that res ipsa loquitur would be an element in the case. If counsel for appellants had any doubt about the matter they had an easy and convenient means of learning that the court did intend to give the instructions proposed. We think that, under the circumstances, the court could well have assumed that appellants' counsel felt that the "defensive" instructions proposed were, in the opinion of appellants, all that were required for appellants' protection. Counsel ought not to be able to sit by while the court is led into giving an erroneous instruction, without in any way calling the error to the attention of the court, and then obtain a reversal and a new trial with all of the delay, possible loss of essential testimony, inevitable fading of memory, and additional expense that attend such a procedure.

We are told that, in 1955, there were 309 appeals in jury cases in California, and that 44 were reversed for error in instructions. (See 32 State Bar J., p. 129.) We agree with Judge Cunningham, that when a lawyer recognizes an erroneous instruction offered by opposing counsel, it ought to be his duty to call it to the court's attention. (32 State Bar J., pp.134-135.) If counsel were required to do so, there would be fewer errors, fewer appeals, fewer consequent delays and a swifter and more just administration of the law. " 'A party should not be permitted to remain quiet and take the chance of a favorable verdict, and then, if the verdict is unfavorable, raise the objection on appeal.' " (*Downing* v. *Silberstein,* 89 Cal.App.2d 838, 844-845 [202 P.2d 91]; see also *McCormick* v. *Red Arrow Bonded Messenger Corp.,* 47 Cal.App.2d

89 [117 P.2d 376] ; *Freitas* v. *Peerless Stages, Inc.*, 108 Cal. App.2d 749, 757 [239 P.2d 671, 33 A.L.R.2d 778].)

Perhaps we should add that our lack of sympathy for appellants' position is about equally balanced by a similar lack of sympathy for the position of respondents. We cannot understand why so many counsel, when there are ample precedents to guide them, draw and present to the courts instructions which are erroneous or, at the least, attempt to stretch the law in their favor. They are thus running the grave risk of winning before the jury, only to lose upon appeal. They unnecessarily imperil their clients' causes, more often than not in cases like this, where their factual position is so strong that "weaker" but correct instructions would not hurt their position at all. Article VI, section 4½ was not, in our opinion, adopted to enable counsel to gamble on the proposition that any error they may themselves induce would be held not to have resulted in a miscarriage of justice.

II. *Other instructions.*

(a) *Duty to advise of risks.*

The court instructed the jury as follows:

"You are instructed that as the relationship between physician and patient is in contemplation of law a fiduciary one it is the duty of a physician and surgeon who has undertaken the care and treatment of a patient to exercise the highest degree of good faith in dealing with his patient and to this end owes a duty to make a full disclosure to the patient of all the facts which mutually affect his rights and interests and of the surgical risk, hazard and danger, if any, so that the patient could be in a position to make an enlightened consent to the operation or procedure."

Appellants contend that "to require a doctor prior to performing a circumcision to advise parents of the possibility of the occurrence of such an injury as occurred in the instant case would be patently absurd." We agree, but, unlike appellants, we do not think that this makes the giving of the instruction reversible error; we think that the jury, like appellants, would have felt that so to apply it would be absurd, and would have applied it, at most, either to postoperative care, during which, according to appellants, infection set in, or to the consent of Kevin's parents in taking Kevin home at a time when, as the evidence shows, a black spot had developed on the *glans*. We think, as we did in *Salgo*, where we criti-

cized a similar instruction, that it would have been better not to give the instruction, or to have modified it so that it would fit the facts of the case. However, we also feel, as we did in *Salgo,* that giving it was not prejudicially erroneous.

(b) *Duty to call a specialist.*

■ The court instructed the jury that a general practitioner has the duty to suggest calling in a specialist if a reasonably careful and skillful general practitioner would do so under the circumstances. Appellants claim that the instruction constituted error since Dr. Bloom, who performed the operation, was under no obligation to call in a specialist to perform the circumcision. Appellants once more rely on *Salgo,* where "There was nothing in the evidence justifying the giving of these instructions." (154 Cal.App.2d at p. 578.)

We cannot agree with appellants' position. There was evidence that a black spot on Kevin's penis was apparent prior to his release from the hospital, that it continued to grow after Kevin was brought home, that both the doctor in emergency on Saturday, when Kevin was first brought back to the hospital, and Dr. Hollister on Sunday told Kevin's parents to return Monday so that a pediatrics specialist and a specialist in urology could observe Kevin's condition, and that by the time the specialists were called in it was too late to do anything about Kevin's condition. Such evidence was sufficient to allow the jury to infer that Dr. Bloom or one of the other doctors should have called in a specialist, not to perform the circumcision operation but to render treatment after the operation had been performed. If the injury was caused by something evident prior to Kevin's discharge which grew continually worse after the discharge it is reasonable to infer that something might have been done at the earlier time; the fact that specialists were later called in indicates that their services might well have been required.

(c) *Standard of care by a specialist.*

■■ At respondents' request the court instructed the jury as follows:

"You are instructed that in some localities there are physicians and surgeons who restrict their practice to specialized fields, and who, by reason of such specializations, presumably become expert in their respective branches of the practice. For convenience, I shall refer to such persons as specialists

and to all other physicians and surgeons as a general practitioner.

"One who holds himself out as a specialist and who undertakes service in a special branch of medical, surgical or other healing science, owes to his patient the duty of possessing that degree of learning and skill ordinarily possessed by specialists of good standing practicing in the same special field and in the same locality under similar circumstances."

Appellants contend that there was no evidence in this case that Dr. Bloom was or held himself out to be a specialist. We think there was. Dr. Bloom testified that he had performed between 600 and 800 circumcisions before operating on Kevin; that he was at the time of the operation in a "residency program" which is "a program of post-graduate study beyond medical school and internship where one specializes in a certain field and narrows one's scope of medicine, and it was in this specialty of obstetrics and gynecology that I did my postgraduate work at the Kaiser Foundation Hospital, so this is just a matter of specializing in that one field," and, when asked whether a resident was one degree higher than an intern he replied, "I hate to call it one degree higher because a general practitioner is certainly on a par in his way. It's just a further specializing and narrowing of one's field of study."

Although Dr. Bloom had only completed one-third of his residency, it would not seem at all unreasonable to hold him to a higher standard of skill than that required of the general practitioner. The difference between the duty owed by a specialist and that owed by a general practitioner lies not in the degree of care required but in the amount of skill required. (33 Cal.L.Rev. 253.) It would stand to reason that one who had performed between 600 and 800 circumcisions would, and should be expected to have more skill in performing such operations than would a general practitioner. The words "holds himself out" do not have any independent significance under the law. In *Hopkins* v. *Heller,* 59 Cal. App. 447 [210 P. 975], a dentist who "for a number of years . . . practiced exclusively the extraction of teeth" (p. 448), was sued. In stating the standard of skill applicable to a specialist the court used the phrase " 'One who holds himself out as a specialist. . . .' " (P. 452.) The opinion, however,

reveals no evidence that the dentist "held himself out" as a specialist other than the fact that he did indeed specialize.

(d) *Unsafe or dangerous condition.*

■ The court instructed the jury as follows:

"If, within the limits of his assigned duty, an agent, servant or employee of a defendant has notice or is charged with notice of a particular matter or thing pertaining to that duty, that notice is notice to his employer or principal; in other words, the knowledge of the agent within the course and scope of his employment or agency will be imputed to his employer or principal.

"Therefore, if you should find that any person employed by the defendant Kaiser Foundation Hospital as an agent, servant or employee of the said hospital, while in the course and scope of his employment, had knowledge of any unsafe or dangerous condition existing, or procedure used, if any, in connection with the care, treatment, diagnosis or other services rendered to the plaintiff Kevin Bruce Valentine, a minor, then you are instructed that such knowledge on the part of any such agent, servant or employee is likewise knowledge on the part of the defendant Kaiser Foundation Hospital."

Appellants claim that there was no evidence of any unsafe or dangerous condition existing or procedure used, and that the word "condition" as used obviously means some condition existing in the hospital that might cause harm, not condition of the patient. It is not unreasonable, however, to read the instruction as applying to a condition of the patient. In any event, we cannot find the instruction prejudicial.

III. *Claimed error as to a hypothetical question.*

■ Appellants complain that the court erred when, over defendants' objection, it permitted plaintiffs' counsel to assume, in hypothetical questions asked Dr. Howard, that the *glans penis* of the minor plaintiff was in a gangrenous condition when he left the hospital. They assert that there was no evidence to support these assumptions. Prior to the asking of the questions, Dr. Howard had testified that he believed that the injury must have been caused by an "inflammatory process" by which he meant "infection." He had also testified that the infection or inflammatory process was named "erosive and gangrenous balanitis." This was certainly evidence that the penis was at some time in a gangrenous condition. There was also evidence introduced prior to the

asking of the questions which would indicate that the black spot was on the penis prior to Kevin's release from the hospital. If a jury could not infer from these facts that gangrene might have set in prior to Kevin's release, any error in asking for unwarranted assumptions was certainly cured after the questions were asked when Dr. Howard testified as follows: "Q. Doctor, what in your opinion could have caused a blackened area that counsel mentions, a discolored area at the distal end of the penis? A. First of all, it could be gangrene. . . ." Affirmed.

Bray, P. J., and Tobriner, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied September 20, 1961.