[Civ. No. 11022.   Third Dist.   Aug. 19, 1965.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Appellant, v. C. TRAVIS ANDERSON et al., Defendants and Respondents.

Harry S. Fenton, Holloway Jones, Jack M. Howard, John P. Horgan and Norval Fairman for Plaintiff and Appellant.

Carr, Kennedy & Asbill, Daniel S. Carlton and Richard J. Asbill for Defendants and Respondents.

PIERCE, P. J.—In this proceeding in eminent domain the state, condemning for a freeway, almost bisected diagonally the Andersons' approximately 150-acre ranch, taking approximately 22½ acres and severing a 72-acre portion (the easterly remainder) from a 54-acre portion (the westerly remainder). The state appeals from an award of $33,630 for the part taken and $37,800 severance damages. Its contentions are (1) that a letter of October 19, 1962, written by a state official, Burton J. Caldwell, was an offer of compromise and not an admission of value and was therefore improperly admitted; and (2) that the trial court inadequately instructed on the subject of "special benefits." We hold, under the evidence, that the court properly admitted the letter into evidence under the rule of *People* ex rel. *Dept. of Public Works* v. *Forster,* 58 Cal.2d 257 [23 Cal.Rptr. 582, 373 P.2d 630], and that any inadequacy of instruction on "special benefits" was not prejudicial. The judgment, therefore, will be affirmed.

The Anderson property in its "before" condition was an irregular (roughly pie-shaped) parcel of land with a 4,000-foot frontage on the east bank of the Sacramento River, lying 1 mile northerly of the City of Anderson and approximately 9 to 10 miles south of Redding. (See sketch.*) The area of its location is known as "Churn Creek Bottom". Its buildings are located in the northeasterly portion of the property. That part of the ranch also has a 700-foot frontage on Churn Creek Road which is a county highway, the main

*See sketch on next page.

road through the "Bottom" area. Ingress and egress to and from that public road was available to all parts of the ranch through a system of farm roads. The property is within, and gets its water from, Anderson-Cottonwood Irrigation District and before the taking had approximately 70 acres irrigated by a system of gravity flow ditches. It was susceptible to development, however, so that 100 acres could have been utilized to grow irrigated crops.

The ranch was used as a stock ranch and farm and in its "before" stage of development was carrying 100 "animal units" (i.e., one mature cow per acre per year). According

to defendants' appraiser, Thomas Linville, the ranch fully developed would support double that number. That witness' overall description of the ranch was: "I think you would class it all as bottom land. There is some river wash. A small amount of gravel and sand in parts of it, but I think generally it is all about as good a bottom land as there is in this part of the country."

The portion of the land lying along the river is subject to periodic overflow when the water reaches flood stage from a release of water over Shasta Dam. Fertility was thereby enhanced through the depositing of silt and this was a benefit to the ranch.

As to the value of the property, the state's appraisal staff had, in 1962, given it the highest "before" valuation which appears in evidence, $240,000; the second highest opinion of value, $210,000, was also that of one of the state's appraisers, Charles Bailey. Defendants' appraiser, Linville, fixed the "before" value at $205,000. The lowest evaluation, $152,000 was stated by Bernard Frese, the other state appraiser.

The 22½ acres being taken by the state for freeway purposes (a part of Interstate 5) runs through the property diagonally from the southeast corner of the property where the freeway crosses the Sacramento River and thence in a straight line northwesterly approximately three-fifths of a mile across the property. (See sketch, *supra*.) The part taken includes the highway, part of which was being built on an 11-foot fill. It also includes a drainage ditch running along the westerly side of the highway. The ditch is from 30 to 50 feet in width, from 3 to 10 feet in depth. Its function is to intercept drainage water along a length of the freeway and frontage road (to be discussed below) and to discharge these waters into the Sacramento River at the southeast corner of the Anderson property where the freeway crosses the river. Reenforced concrete pipes are being built through the freeway fill to preserve the Andersons' presently unused riparian rights. This basic plan for the freeway "taking" has not changed from its inception.

The condemnation action was filed by the state in January 1963. Various changes, however, designed to mitigate the Anersons' severance damages, occurred both before and after the filing of the complaint. As originally conceived, the plan involved no frontage road extending to the westerly portion of the Anderson place (hereinafter "the westerly remain-

der'') and no underpass or overpass was provided to give ingress and egress between the westerly and easterly remainders. Therefore the state planned to purchase the entire westerly remainder of 54 acres. As stated above, the state's appraisal staff had appraised the Anderson property at $240,000. Under this appraisal an offer was made of $120,000 for the part to be taken plus the western remainder, roughly half the ranch. The Andersons requested a change, stating they wished to continue to operate the property as a ranch and as a unit. They asked the state to leave the westerly remainder and build overpasses across the freeway giving them access to that parcel.

Unwilling to provide an overpass, the state made an alternative proposal which was expressed in Caldwell's letter of October 19, 1962. That letter, admitted into evidence over the state's objection, and the circumstances of its offer and receipt in evidence will be discussed below. It provided, *inter alia,* for the construction of an underpass so that the Andersons could continue to farm their property as a unit. Although the condemnation action was filed by the state in January 1963, negotiations, according to Anderson, continued until May 1963 for the purchase of the part taken plus the construction by the state of the underpass and other works. In September 1963 the state decided to extend a macadamized frontage road from the northerly boundary of the adjoining Bell property (where, under the original plan, it had ended) to the northerly boundary of the westerly remainder. The frontage road would connect that parcel with a "Knighton Road Interchange" to the north. It was the state's theory at the trial that this extension would preserve substantially the entire value of the westerly remainder and that the construction of an underpass would be unnecessary.

The Andersons and their appraiser did not agree with this theory. Linville testified that the highest and best use of the westerly remainder still would be agricultural but that after the taking it would be economically impossible to farm the property as a unit. To reach the westerly remainder from the easterly remainder when the freeway was built would require travel northerly along the Churn Creek Road to and across Knighton Road Interchange then southerly along the frontage road back to the westerly remainder, a trip of 5½ miles, or a round trip of 11 miles.

Linville appraised the part taken at $33,570 and the sev-

erance damage at $44,160, a total of $77,730. He found no special benefits. He divided the severance damages as follows: $29,730 to the westerly remainder and $14,430 to the easterly remainder. (This was at the rate of $550 per acre to the former and $200 per acre to the latter.)

His reasoning was that the westerly remainder in the "after" condition had no value then or in the foreseeable future for any purpose other than farming; that it had no value for residential purposes because: "It is unusual type of property, and it is at the end of a dead-end road, jammed up against a freeway, with a drainage ditch on one side, and about half of it is overflow land, which is going to be awfully hard to develop to anything, and I just don't know of another property like that in the country. I don't think there is one." He also testified that an industrial plant immediately across the river from the westerly remainder would make the use of the property for residential purposes unattractive. The diminution of the value of both the easterly and westerly remainders was attributed (1) to the separation of the properties making it impossible to operate them as a unit, (2) to the increased operating costs due to the irregularly shaped parcels left by the freeway and drainage channel traversing the property diagonally. (See sketch, *supra.*)

The state produced two appraisers, Bernard Frese of Santa Rosa and Charles Bailey, a former right-of-way agent. These witnesses appraised the value of the "take" at $20,500 and $29,133, respectively. (In 1962 the state's staff appraisers had valued the part taken at the rate of $1,500 per acre, or a total of $33,495, slightly lower than Linville's appraisal.)

The state's appraisers at the trial, for reasons which were widely disparate, agreed that the cutting in two of the Anderson ranch by the freeway and drainage ditch would cause little or no damage. As damage to the easterly remainder, Frese allowed $750 so that Anderson "could rearrange a few of the fences that were left open at the ends. . . ." Bailey allowed no damage to that portion of the ranch, his opinion being that it "can be farmed in the after condition just as readily . . . as it was before." Regarding the westerly remainder, Frese gave it a value of $45,900 (54 acres at $850 per acre) in the "before" condition, and a value of $43,650 in the "after" condition *with the frontage road,* a diminution in value of $2,250. The witness did not make clear what the highest and best use of the westerly remainder would be

in the "after" condition nor did he explain why it would then be worth $43,650. He testified: ". . . I did not think that this particular portion attributes [*sic*] anything in the way of income, from an agricultural standpoint." His statement of uses other than agricultural were hedged in terms of "possibly" and "perhaps," e.g., "I say you could possibly sell gravel from it" or "gravel deposits will some day be in demand, perhaps." "You have heard mention of, oh, well, I suppose recreational use," "or if someone wanted to develop it to some other use," "or maybe a homesite, or something of that nature . . . remembering the fact this is subject to inundation, and that is a big hazard, and that is the problem the property suffered." This witness saw special benefits from the construction of a frontage road but stated he would not want to place any dollar benefit on it.

State witness Charles Bailey, on the other hand, took a much more optimistic view of the future of the severed westerly remainder. Bailey did not agree with Frese that it contributed nothing to the value of the ranch from an agricultural standpoint. He testified: "In the before condition this part of the property was in part good agricultural land. In part it was marginal agricultural land." He did not attempt any segregation of values between the several parcels of the ranch, however, but averaged the entire property at $1,300 per acre, including the westerly remainder. With the frontage road constructed, Bailey considered the highest and best use of the land to be residential. The flooding potential he met by finding that the portions subject to flood would be complementary to the lands at higher elevations where the homes could be built. He visualized a boat harbor in conjunction with the residential use. The building of a trailer court he also deemed to be feasible. Bailey stated the westerly remainder to have a market value of $1,300 per acre in the "before" condition and of $1,400 per acre after the taking. He therefore found no severance damage and $5,400 special benefits (54 acres at $100 per acre).

We have deemed this detailed[1] delineation of the battle of the experts to be necessary in a proper consideration of both contentions of appellant. We first consider the contention that the Caldwell-to-Carlton letter of October 19, 1962, was improperly admitted into evidence.

---

[1]Detailed though our statement of facts has been, we have omitted all reference to "comparable sales" generously used by the appraisers on both sides to buttress their appraisals given.

The letter reads as follows:

"October 19, 1962
II-Sha-3-A
Right of Way
Parcel 4373

"Mr. Daniel S. Carlton
Attorney at Law
1415 Court Street
Redding, California

Dear Mr. Carlton:

"As we discussed briefly in your office the first part of this week, I am forwarding to you the State's alternate proposal on the C. Travis Anderson property in Churn Creek Bottom.

"I am enclosing a sketch that will give you a birds-eye view of this proposal. The area to be acquired consists of 22.33 acres which will leave an excess between the proposed highway and the river of 57.54 acres and a remainder on the other side of 72± acres. The State's offer for the strip is $64,095.00.

"To facilitate the property owner's ranch operation after acquisition of this strip, the State, at no expense to the property owner, shall perpetuate the irrigation facilities in the vicinity of Engineer's Station 610+00±, construct a 10'x12' equipment pass (which would have to be maintained by the property owner after installation) and construct a gravel road from the end of the frontage road to the property owner's existing road in the vicinity of Engineer's Station 607+00±.

"If you find, after presenting this to the property owner, you would like to discuss it with me further, I will be most happy to do so at your convenience.

Sincerely,

BURTON J. CALDWELL
Associate Right of Way Agent

BJC-fsm
Encl."

On the first day of the trial and before the letter had been referred to by defendants, the state's attorneys, anticipating its offer, called and examined Eugene Wahl, a civil engineer employed by the Division of Highways, outside the presence of the jury. It was brought out through Mr. Wahl that, as stated above, the state had originally not proposed to con-

struct a frontage road to the northerly boundary of the west-erly remainder of the Anderson property but had planned its terminus at the northerly boundary of the Bell property and had planned to buy the westerly remainder.

On cross-examination of Wahl it was developed that when the letter was written in October 1962 the state planned as an "alternate" to leave the westerly remainder and to provide, among other works, the 10'x12' equipment underpass. The estimate of its cost was $21,700.

In a foundation-laying cross-examination of Caldwell (un-der Code Civ. Proc., § 2055) later in the trial the following further facts were developed: The letter had been preceded by statements theretofore made by Caldwell to defendants' attorney, Daniel Carlton (in connection with negotiations in previous condemnation litigation) that the state could pay no more than its staff's opinion of fair market value for prop-erty.[2] Caldwell also testified that the letter had been written based upon the appraisal made by the state's staff of ap-praisers referred to above: he stated that he had "complete" authority to write the letter. The appraisal was not confiden-tial. "The appraisal was there, and it was my duty to get the appraisal, once it was approved, to the property owner." It had been approved by the main right-of-way office in Sac-ramento. Caldwell affirmed on cross-examination that the let-ter was written not as an effort to negotiate but as a matter of putting the state's position as to value in the hands of defendants' attorney.

Caldwell testified he had made several mistakes in writing the letter. We will refer to these below.

Both parties rely upon *People* ex rel. *Dept. of Public Works* v. *Forster, supra,* 58 Cal.2d 257. In that condemnation action a letter from a state right-of-way agent to defendants' attorney had stated (p. 260): "The State hereby offers you the sum of $218,000.00 for land and damages. This amount is a compromise figure based on the market value of the parcel as set out in the above mentioned suit." A termination date for the offer was expressed. The introduction of the letter into evidence was objected to upon the ground it was an offer of compromise and, as such, inadmissible. Before ruling, the trial court had heard testimony and argument outside the jury's presence. From the extrinsic evidence so taken the trial court concluded that the letter was not simply an offer

---

[2]Appellant in its brief admits this to be a "well known rule" adopted by the state in acquiring property in eminent domain.

of compromise but an independent admission as to the market value of the property. Our Supreme Court (per Justice Schauer) affirmed the judgment. The extrinsic evidence which in the *Forster* case was held to justify admission of the letter included evidence that previous to the writing of the letter the state right-of-way agent had advised defendants' attorney that the state could only pay what its appraisers had determined the property to be worth. The court in *Forster* sets forth (on pp. 263-264) the following rules: (1) That offers of compromise are inadmissible, the reason being that "a person is entitled to endeavor to 'buy his peace' without fear that his offers of compromise for such purpose will be used against him if not accepted. [Citations.] Further, the law favors compromises. [Citations.]" (2) Declarations of fact, however, which are not merely concessions in an offer ". . . 'but are statements of independent facts, are admissible. . . .' [Citations.]" (3) That the question whether a declaration amounts to a mere offer or an admission is to be tested by the rule that " '*a concession which is hypothetical or conditional only can never be interpreted as an assertion* representing the party's actual belief, and therefore cannot be an admission; and, conversely, an unconditional assertion is receivable, without any regard to the circumstances which accompany it. . . .' "

The trial court in the case at bench applied the test stated in *Forster* to the facts before it (as recited above) and concluded that the letter was admissible.

In *Forster* it was held that it was proper for the court to determine in the first instance the preliminary question of the admissibility of the letter by hearing extrinsic evidence outside the presence of the jury. (*People* ex rel. *Dept. of Public Works* v. *Forster, supra,* 58 Cal.2d at p. 260; Code Civ. Proc., § 2102.) That determination having been made and the evidence having been admitted, it then becomes the jury's exclusive province to assess the effect and value of the evidence. (Witkin, Cal. Evidence (1958) p. 620; Code Civ. Proc., § 2061; *People* v. *MacDonald,* 24 Cal.App.2d 702, 705 [76 P.2d 121].) In the case at bench part of the extrinsic evidence, as stated above, was heard by the court outside the presence of the jury but that part was thereafter repeated in the jury's presence. The taking of extrinsic evidence in the presence of the jury (after the court had made its preliminary determination of the admissibility of the letter) occurred because parts of the letter were ambiguous. The letter

states that the state is making an "alternate proposal." Alternate to what? It states: "The State's offer for the *strip* is $64,095.00" What strip? These statements being ambiguous, extrinsic evidence to explain their meaning was, of course, proper. It was explained by Caldwell that the proposal was an "alternate" to a plan which would have left the westerly remainder landlocked and valueless and which would have required the state to purchase it. The offered sum ($64,095) for the "strip" was explained to be intended to include both the price for the part taken and for severance damages to both the easterly and westerly remainders under the alternate plan.

The trial court was most liberal in permitting Caldwell to explain—really to contradict—other statements of the letter which would seem to be unambiguous. The declaration that the state would undertake to "perpetuate the irrigation facilities" was permitted to be interpreted as not having been intended to mean that it would perpetuate the Andersons' *existing* facilities—a gravity flow irrigation ditch system using Anderson-Cottonwood Irrigation District water—but that it would perpetuate the Andersons' *riparian rights*. Caldwell was also permitted to explain that in speaking of the state's undertaking to "construct a gravel road from the *end of the frontage road* to the property owner's existing road" (italics supplied) he did not intend to refer to a frontage road at all but only to a "farm service road" on the Anderson property under the underpass then proposed to be built.

The jury was not required to believe Caldwell's asserted "mistakes" or his explanations. It could have believed that the letter meant what the letter said.

When the trier of fact, whether it be the trial court or jury, makes a finding of fact on substantial evidence, it is not the function of an appellate court to review that determination nor do we have the power to do so. (*People* ex rel. *Dept. of Public Works* v. *Glen Arms Estates, Inc.,* 230 Cal. App.2d 841, 863-865 [41 Cal.Rptr. 303]; *People* ex rel. *Dept. of Public Works* v. *Graziadio,* 231 Cal.App.2d 525, 532-533 [42 Cal.Rptr. 29].) In the case at bench substantial evidence recited above does support the trial court's determination and the implied finding of the jury. Both the letter itself and the extrinsic evidence which explained it are reasonably susceptible to the interpretation that the state in October 1962 was making not a mere tentative or hypo-

thetical offer to compromise but an independent declaration representing the state's actual belief regarding the market values involved and the "just compensation" properly payable to the Andersons.

■ Other contentions of the state regarding the admissibility of the letter may be summarily disposed of. It contends the letter had no relevancy because the plan was thereafter changed, abandoning the underpass and providing in lieu thereof a paved frontage road. If, as the state later contended, the building of the frontage road had concededly wiped out all severance damages, then the letter would have been irrelevant. As the state viewed the matter from September 1963 on the provision of a paved frontage road had not only wiped out all severance damages, it had actually benefited the westerly remainder by converting it into prime residential property with a boat harbor potential. But the property owners and their witness did not see it that way. Both Mr. Anderson and Linville testified that the condemned property, a 150-acre ranch operated as a unit and still in the process of development, was a valuable agricultural property suitable for no other use; and that when it was cut in two by the freeway it had been badly damaged. A vital issue between the state and the condemnee had thus been raised, and it was indeed relevant to that issue that the latter could show that until May 1963 the state's appraisal staff had shared the view that this *was* agricultural property, the integrity of which as such should be preserved and that to achieve that end the state had agreed that an underpass would be built and the existing irrigation system would be perpetuated.

■ Appellant cites, among other cases, *Sacramento etc. Drainage Dist.* ex rel. *State Reclamation Board* v. *Reed,* 215 Cal.App.2d 60 [29 Cal.Rptr. 847], holding that *speculative* evidence couched in appraisers' opinions of diminished values occasioned by assumed "prospective purchaser" reactions to damages caused by possible future plans or projects is inadmisible. The rule stated has no applicability here. The rule is based upon reasoning that if such evidence were to be admitted a jury would be permitted to fix severance damages not upon works built under the plan then at issue but upon conjectural future damage caused by other works. That was not the purpose of this evidence and that could not have been its effect upon the jury.

■ The state also contends that the Caldwell letter was inadmissible because it was based upon the state appraisers'

report and that the report was confidential under the attorney-client privilege. Cited is *People* ex rel. *Dept. of Public Works* v. *Glen Arms Estate Co., supra,* 230 Cal.App.2d 841. In that case an appraiser's report had been prepared for and had been communicated to the state's attorneys for their purposes in the litigation and was considered confidential. There also the report was offered in evidence. Here the report was not admitted and was not sought to be admitted. Moreover, the report was not deemed confidential. It was prepared for the purpose of having its contents submitted to the Andersons, and Caldwell testified he was instructed to relate all of the matters to which he testified to the Andersons through their attorney.

█ A page and a half of the state's opening brief is devoted to its argument that the trial court inadequately instructed on special benefits. Summarized, that argument is: A jury under Code of Civil Procedure section 1248 is required to make three major determinations in an eminent domain proceeding, special benefits being one of them; state witness Bailey testified the frontage road was a $5,400 special benefit; each party is entitled to have the jury instructed on all pleaded "vital" theories supported by evidence (*Phillips* v. *G. L. Truman Excavation Co.,* 55 Cal.2d 801, 806 [13 Cal.Rptr. 401, 362 P.2d 33]); nine proper instructions were submitted to the trial court in this case; the judge "refused" to give even one of them.

The record shows that the trial judge DID instruct on special benefits, although he had mislaid and overlooked the formal instructions submitted by both parties thereon; the judge's informal instruction, somewhat vaguely stated, was given after the oversight was discovered and just before the case was given to the jury.

We hold that if, under the rather peculiar circumstances of this case, more explicit instructions on special benefits should have been given, which is doubtful, the error was harmless because the jury was not misled.

By Code of Civil Procedure section 1248, subdivision 1, the jury must ascertain and assess the value of the property taken. By subdivision 2 of that section, if the property condemned is part of a larger parcel, the jury must also determine and assess "the damages which will accrue to the portion not sought to be condemned, by reason of its severance from the portion sought to be condemned, and the construction of the improvement *in the manner proposed by the*

*plaintiff.''* (Italics supplied.) By subdivision 3 the jury must also ascertain and assess ''Separately, how much the portion not sought to be condemned . . . will be benefited, if at all, *by the construction of the improvement proposed by the plaintiffs.''* (Italics supplied.) This section further provides that a process of subtraction shall then take place, i.e., special benefits are subtracted from severance damage; the remainder is the amount to be awarded for severance unless the remainder is zero or a minus figure, in which case no severance damages are paid. (Under California law payment for the full market value for the part taken is unaffected by special benefits.)

No case has been cited to us which holds that where something has been inserted into a highway plan *solely for the purpose of mitigating severance damages* that feature of the plan is to be regarded also as a special benefit. We are not compelled to, and we do not, decide that question here. But we do note that when the only special benefit claimed is some part of the plan of construction *which lessens the severance damage,* an analysis of the wording of section 1248 will show that literal compliance therewith is difficult, and when, in addition thereto, the appraisers' method of arriving at severance damages has been by ascertaining the ''before'' and ''after'' market values of the severed portions to determine the diminution of value due to *''the construction of the improvement in the manner proposed by the plaintiff''* the arithmetical problem to be performed becomes an *impossible* one. (Italics supplied.)

Here, the only special benefit claimed *was* a factor of ''the construction of the improvement in the manner proposed'' by plaintiff, to wit: the extension frontage road. That extension was designed *solely* for the purpose of lessening (or, according to the state's theory, obliterating) severance damages to the westerly remainder. Here also every appraiser who testified used the ''before'' and ''after'' method of determining severance damages. In their ''after'' valuation they considered the value of the westerly remainder NOT in a landlocked condition which would have been its situation *but for the frontage road;* instead they considered its market value WITH the frontage road. Had they considered the value of landlocked land, the ''after'' value necessarily would have been zero, or nearly so, since the only access thereto would be by boat or helicopter.

Thus in the arithmetical problem of subtraction to be per-

formed by the jury, the minuend included the effect of frontage road as a factor and, in the case of Bailey's testimony, so also did the subtrahend. How then could an accurate remainder, i.e., the sum representing the net severance damage, be obtained? A jury could only have done the arithmetic contemplated by section 1248 accurately by having been first presented with a sum representing the value of the westerly remainder *without* the frontage road, i.e., in a landlocked situation.

However, we need not struggle herein in the morass thus created and the dilemma thus presented.

During, and towards the close of, the court's instruction of the jury, the record shows the following:

The court said: "The only other thing I wondered if I skipped one on benefits, but I guess not. I told the jury if they felt there was any special benefit as shown by the evidence they could add that to it [that statement was correct], but in reading them over I just had the impression in the back of my mind that I must have skipped one of those instructions, but if I did the Court Reporter will know it, and I am sure it will not be harmful on that matter, because the rule of law can be expressed in one line, and has been expressed, that the jury is to find the value of the property taken, also, if they find damages, the amount of it. If they find benefits, special benefits, the amount of that."

Mr. Horgan, one of the state's attorneys, was the next to speak. The court's quoted statement, although not framed in the form of a question, seems to us to call for an answer if disagreement with the statement was felt. Mr. Horgan did not disagree, neither did he agree. He changed the subject.

The law in California is settled by statute—we think unfortunately—that the giving or refusal of an instruction is deemed excepted to even though no objection to such instruction is made when the instruction is given. (Code Civ. Proc., § 647; *Hensley* v. *Harris*, 151 Cal.App.2d 821, 826-827 [312 P.2d 414].) Justice Duniway, in *Valentine* v. *Kaiser Foundation Hospitals*, 194 Cal.App.2d 282 [15 Cal.Rptr. 26], quoting Presiding Justice Shinn (in the *Hensley* case) says (on p. 290): " 'Perhaps it would be better practice to require specific objections to the instructions proposed by one's adversary, but that is not our law nor is it a matter for judicial legislation.' " As pointed out in the *Valentine* case (on p. 291) in 1957 the Legislature amended Code of Civil Procedure section 607a giving counsel the right, before the

commencement of argument, to demand from the court the instructions which are to be given. We are not advised that this information was sought in the case at bench. The court in *Valentine* further states (on p. 291) : ''Counsel ought not to sit by while the court is led into giving an erroneous instruction, without in any way calling the error to the attention of the court, and then obtain a reversal and a new trial with all of the delay, possible loss of essential testimony, inevitable fading of memory, and additional expense that attend such a procedure.

''We are told that, in 1955, there were 309 appeals in jury cases in California, and that 44 were reversed for error in instructions. (See 32 State Bar J., p. 129.) We agree with Judge Cunningham, that when a lawyer recognizes an erroneous instruction offered by opposing counsel, it ought to be his duty to call it to the court's attention. (32 State Bar J., pp. 134-135.) . . . ' ''A party should not be permitted to remain quiet and take the chance of a favorable verdict, and then, if the verdict is unfavorable, raise the objection on appeal.'' ' [Citations.]'' The quoted statement seems all the more applicable where the court, doubtful of whether he has given an offered instruction, tries to improvise one and falls into error.

The court in *Valentine* did not hold that the failure to object, when under the circumstances objection seemed called for, constituted a waiver. Its holding was that the error was not prejudicial. We rest our holding upon the same conclusion. There was no harm done here. The jury was not really misled as to the functions it must perform to arrive at a true determination of just compensation.

The state scoffs at the court's informal instruction regarding special benefits as lacking meaning. It certainly did lack definition. But in the context of this case if the jury was not accurately instructed as to how to perform the arithmetic of reaching a sum representing just compensation on the verdict form, then neither had any of the appraisers been informed as to how to present dollar-and-cents evidence which would have permitted the jury to express the arithmetical problem. Nevertheless, the appraisers' methods were understandable, we think the jury understood them, and the judge's instruction was meaningful to the jury in establishing this understanding.

As the case was tried it was obvious that the only possible ''special benefit'' which was or could be claimed was the inclusion of the frontage road in the state's plan, and it was

around the existence of this road that all testimony regarding the "after" value of the westerly remainder revolved. Each of the experts, although apparently experiencing the same difficulty as we do as to how one can subtract "x" from "x" and still get "x," nevertheless knew the value he was giving to the frontage road as a factor in the determination of severance damages, and each was quite clear in expressing his own special theory to the jury. The jury was told by the court how to express its finding in this regard in its verdict. The form of verdict included the following on special benefits:

" 'Three, the special benefits, if any, which will accrue to the remainder of the property . . . by reason of the construction of the public improvements, is the sum of,' dollar sign, blank.''

The trial court further instructed the jury: "The Foreman will sign the verdict, whatever it is. May I suggest, of course, there must be some value for the [part taken]. Conceivably you might find no damages or no benefits. If you do, put in the word 'none.' Don't just leave it blank. We want the verdict to be full, so where it says 'in the sum of,' dollar sign, 'for damages and benefits,' why, the word 'none' or the figure '0' would be better than just disregarding it entirely in that case.''

The jury, heeding that advice, inserted the sum $37,800 for severance damages and "None" for special benefits. That meant it had considered the "before" and "after" values of the severed portions *with the frontage road* and had fixed the severance damages accordingly. The state was not entitled to have the value of the frontage road deducted twice.

The jury clearly had itself appraised the value of the frontage road as a mitigating factor, it had accepted none of the severance damages with-the-road figures stated by the appraisers, it had set its own figure, $37,800. There is no reason to doubt that its deliberation had included a sampling of Mr. Bailey's $5,400 residential-boat-harbor figure. The jury had tasted, but could not swallow it. Our careful analysis of the entire record makes it understandable why it could not—the theory was visionary and speculative.

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied September 15, 1965.