[Sac. No. 7055. In Bank. Apr. 3, 1959.]

ALBERTA WOLFSMITH, Appellant, v. PAUL KING
MARSH et al., Respondents.

Russell P. Studebaker and Carl B. Munck for Appellant.

Joseph F. Rankin, Peart, Baraty & Hassard, Alan L. Bonnington and Richard G. Logan for Respondents.

McCOMB, J.—From a judgment in favor of defendants after trial before a jury in an action to recover damages for alleged malpractice in administering a hypodermic injection of sodium pentathol, plaintiff appeals.

*Facts:*\* In 1953 plaintiff, a housewife 46 years of age, consulted defendant Dr. Barr, at which time she was given sodium

---

\*The evidence is viewed in the light most favorable to plaintiff, since the rule is established that where, as in the instant case, plaintiff (appellant) does not question the sufficiency of the evidence to support the judgment but contends that it was error to refuse a requested instruction, a reviewing court must view the evidence in the light most favorable to the party offering the instruction. (*Sills* v. *Los Angeles Transit Lines,* 40 Cal.2d 630, 633 [1] [255 P.2d 795]; *Edgett* v. *Fairchild,* 153 Cal.App.2d 734, 738 [2] [314 P.2d 973].)

pentathol on at least four occasions and showed no allergy to it, nor did she suffer harm from the injections. One such injection was given by defendant Dr. Marsh. All were given in her arm.

On August 3, 1954, plaintiff, while under the care of Dr. Barr, was admitted as a patient to a hospital to determine the cause of her obesity. She was nervous and in somewhat poor health, but suffered no particular pain or other discomfort. During the first 12 days of her hospitalization numerous laboratory tests and examinations were made. Finally Dr. Barr ordered that she be given basal metabolism tests. Because of her nervous condition and emotional makeup, he ordered one such test to be given her under sodium pentathol and another without it.

In accordance with the custom at the hospital, any doctor who was free would act as anesthetist. In this case it was Dr. Marsh. According to plaintiff's testimony, Dr. Marsh first endeavored to inject the left arm and being unsuccessful there proceeded directly to inject the inner aspect of her right knee. She stated that at the point where the injection was made there was visible to her a small "raised bubble place," which she characterized as a varicose vein; that although she became a bit "fuzzy" following the injection she did not go to sleep; that there was extreme pain in her leg following the injection but that she was unable to complain vocally because of a rubber apparatus which had been placed in her mouth and which was attached to equipment which was being used; and that upon being returned to her ward she felt "excruciating" pain in her leg.

Dr. Barr stated that when he saw plaintiff approximately an hour after the injection she was complaining of pain in her leg and that he examined it and found a reddened area around the site of the injection which was more firm than the surrounding tissue.

Plaintiff suffered constant pain in her leg during the next 63 days, 55 of which she spent in the hospital undergoing treatment in an attempt to effect a cure of her injury.

Within two or three days after the injection, a thrombosis developed, and shortly thereafter at the site of the injection there appeared a "slough ulcer."

After her dismissal from the hospital in October 1954 she continued to have extreme pain in her leg. In January 1956 she consulted Dr. Kenney, who upon examination of plaintiff's leg found a scar into which ran two visible varicose

veins. She was placed in a hospital for nine days, during which time he and other doctors in consultation with him made a further study of her condition. Dr. Kenney concluded that she had phlebitis, an inflammation of the vein; anterior tibial strain due to the manner in which she walked to alleviate the pain; and that at the point of the original injection she was suffering from causalgia, an "irritating type of pain due to some type of irritation within the blood vessel." Under another injection of sodium pentathol, given in her arm, Dr. Kenney performed surgery on the leg and removed the vein, which was diagnosed as varicose, from the groin to the ankle and also removed the scar on her knee. At the same time an incision was made on her right flank and a piece of the sympathetic nerve removed.

*Questions*: First. *Did the trial court err in refusing to give an instruction on the doctrine of res ipsa loquitur, as requested by plaintiff?*

*Yes.* The following rules are here applicable:

■ 1. The conditions requisite for the application of the doctrine of res ipsa loquitur are: (a) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (b) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (c) it must not have been due to any voluntary action or contribution on the part of the plaintiff. (*Cavero v. Franklin etc. Benevolent Soc.,* 36 Cal.2d 301, 311 [5] [223 P.2d 471]; *Ybarra v. Spangard,* 25 Cal.2d 486, 489 [1] [154 P.2d 687, 162 A.L.R. 1258]; *Bauer v. Otis,* 133 Cal.App.2d 439, 443 [3] [284 P.2d 133] [hearing denied by the Supreme Court].)

■ 2. In determining whether an accident was of such a nature that it probably was the result of negligence by someone, the courts have relied upon both (a) common knowledge and (b) the testimony of expert witnesses, as well as the circumstances relating to the accident in each particular case. (*Zentz v. Coca Cola Bottling Co.,* 39 Cal.2d 436, 446 [13], [14] [247 P.2d 344]; *Bauer v. Otis, supra,* p. 443.)

■ 3. It is a matter of common knowledge among laymen that injections in the arm, as well as other portions of the body, do not ordinarily cause trouble unless unskillfully done or there is something wrong with the serum. (*Bauer v. Otis, supra,* p. 444.)

■ 4. The conclusion that negligence is the most likely

explanation of an accident or injury is not for the trial court to draw or refuse to draw so long as plaintiff has produced sufficient evidence to permit the jury to draw the inference of negligence, though the court itself would not draw that inference. The court must leave the question to the jury where reasonable men may differ as to the balance of probabilities. (*Seneris* v. *Haas*, 45 Cal.2d 811, 827 [13] [291 P.2d 915, 53 A.L.R.2d 124].)

Applying the foregoing rules to the present case, it is conceded that conditions (b) and (c) under rule 1, *supra*, were present, thus leaving for our determination this question: Was there evidence from which the jury could find that the requirements of subdivision (a) of rule 1, *supra*, were present? This question must be answered in the affirmative for these reasons:

(One.) As pointed out under rule 3, *supra*, today it is a matter of common knowledge that injections in the arm or other portions of the human body do not ordinarily cause trouble unless unskillfully done or there is something wrong with the serum which is injected.

(Two.) There was testimony of expert witnesses to the same effect, which may be summarized as follows: (a) Dr. Barr testified that in the exercise of the standard of care in that community a physician would not inject sodium pentathol into a varicose vein, since the walls of such veins do not have normal tensile strength, tearing easier and not having the resistance to irritants that normal veins have. (b) Dr. Roberson, a local physician, testified that only in an emergency would he inject a varicose vein and that the standard of practice in the community forbade such an injection. (c) Dr. Marsh stated that he had seen leakage and it had happened to him "scores of times . . . but never a reaction like this patient had." (d) Drs. Barr and Kenney both testified that plaintiff's difficulties were the result of the injection.

In view of the foregoing testimony, under rule 4, *supra*, the trial judge, under proper instructions, should have left to the jury the determination of the question of fact whether defendant Dr. Marsh was negligent in injecting sodium pentathol into a varicose vein in plaintiff's leg.

*Dees* v. *Pace*, 118 Cal.App.2d 284 [257 P.2d 756], relied on by defendants, is not here in point, for in such case it was pointed out at page 290 [3] that "There is no testimony in the record here, either expert or otherwise, that would support the submission of such an issue to the jury."

 Second. *Was there a partnership between defendants Dr. Marsh and Dr. Barr?*

This question must be determined by the jury from the evidence presented to it. The record contains evidence which would support a finding that there was a partnership between the doctors.

It discloses that in 1953 Dr. Barr gathered several doctors from various parts of the United States for the purpose of forming a partnership. Dr. Barr specialized in surgery; Dr. Keeton, one of the group selected by Dr. Barr, was a specialist in internal medicine; Dr. Steen was a general practitioner; and the fourth member of the group, Dr. Marsh, specialized in gynecology.

In November or December 1953, in furtherance of Dr. Barr's purpose to form a partnership with the three doctors, the books of the doctors were set up on a partnership basis. In December 1953 Dr. Keeton, the specialist in internal medicine, decided to leave the area and did so in January 1954, entering military service. He returned for a brief period in the latter part of 1954 and then left again. Shortly thereafter Dr. Steen left.

During the year 1954, including August of that year, the doctors, together with a Dr. Faulkner, practiced together in the Mendocino Medical Center in Ukiah. The premises in which the group practiced were owned by Dr. Barr and Dr. Woods as copartners. The fixtures, medical equipment and medical library of the Center were owned by Dr. Barr personally, except that Dr. Steen had an interest therein to the extent of $10,000.

Dr. Marsh first came to the Center in July 1953. For the first six months he had a $1,500 monthly guarantee from Dr. Barr. The guarantee ceased in January 1954. During this period the doctors in the group shared expenses and shared the net return. Bills were sent out on billheads of the Medical Center showing the name of the doctor who rendered the particular services. When the fees were collected, they were placed in one bank account. Expenses were then paid, and the net proceeds were divided each month equally among the members of the group.

The judgment is reversed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., Spence, J., and White, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.