[Civ. No. 21581.   First Dist., Div. Three.   Apr. 27, 1965.]

JO ANN EDELMAN, an Incompetent Person, etc., et al., Plaintiffs and Appellants, v. PAUL ZEIGLER, Defendant and Respondent.

John Wynne Herron, Herron & Winn and James B. Leech for Plaintiffs and Appellants.

Peart, Baraty & Hassard, Robert D. Huber and Richard G. Logan for Defendant and Respondent.

DEVINE, J.—The question in this medical malpractice case is whether a res ipsa loquitur instruction should have been given. Appellants, plaintiffs, do not challenge the sufficiency of the evidence to support the defense verdict, if the charge to the jury be judged correct. Appellants offered two instructions on the doctrine of res ipsa loquitur, of which one would unqualifiedly apply the doctrine, and the other would apply the doctrine only if the jury should find that the injury is of a kind which ordinarily does not occur in the absence of someone's negligence (and the conditions of defendant's exclusive control and lack of plaintiffs' contribution exist, elements unquestioned here). Appellants' reliance is on the validity and necessity of the latter of these instructions, that of conditional res ipsa loquitur.

During a laparotomy, or surgical section of the abdominal wall, in the course of which a ruptured appendix was discovered and excised, appellant Jo Ann Edelman, a 37-year-old woman, suffered a cardiac arrest. Her brain was without sufficient oxygen during four to six minutes. She suffered brain damage of such severity that she has been bedridden and incapacitated for every human action save giving answers "yes" or "no" by blinking her eyes, showing contentment when her husband or children visit her by making a cooing sound, and exhibiting displeasure by crying when she is annoyed by the radio.

The cardiac arrest as the cause of the brain damage being agreed, the problem before the jury was the cause of the cardiac arrest. Appellants' contention was and is that the cause was hypoxia, deficient oxydization, and that this resulted from negligence of respondent, Dr. Zeigler, who was in charge of anesthesia during the operation. Respondent's position is that hypoxia was not necessarily the cause of the calamity, but that even if it was, negligence was not established.

### General Facts

The general facts are these: Mrs. Edelman had suffered nausea and pain, accompanied by edema, in her pelvis, and an elevated temperature, and her physician preoperatively suspected infection of the appendix or a tube. Surgery disclosed that the appendix was ruptured and gangrenous. About an hour and a half after the operation had commenced, and while the surgeon was putting in the third to last suture in the skin after closing the wound, respondent, Dr. Zeigler,

the anesthetist, announced that he could not obtain either blood pressure or pulse. The surgeon, Dr. Roberts, instructed his assistant, Dr. Leoni, to commence external cardiac massage, which was done. Dr. Roberts changed his gloves, made an incision in the patient's chest, a thoracotomy, and saw the heart, which was beating feebly. In a few seconds the heart resumed its normal beat, and after the surgeon determined that the heart was beating normally, he closed the chest. During the night it was discovered that the patient was not awaking as would have been expected, and ultimately it was found that she had suffered brain damage.

The discovery by Dr. Zeigler that no blood pressure or pulse was discernible was made immediately after he saw that the breathing bag had suddenly stopped moving. When the lack of pulse and blood pressure was found, Dr. Zeigler turned off the flow of nitrous oxide and commenced the flow of 100 per cent oxygen. He also immediately started squeezing the bag in order to help the patient breathe.

The facts relating to the anesthetist, Dr. Zeigler, and to his performance of duty in the operation are these: He is a general practitioner in Petaluma. He had not received formal specialty training in anesthetics. During the seven years prior to the operation, he gave from one to three anesthetics a week. On November 26, 1960, Dr. Roberts telephoned Dr. Zeigler about 45 minutes or an hour before the scheduled time for the operation. Dr. Zeigler first saw the patient in the operating room. She had received preanesthetic medication of 75 milligrams of demerol, an analgesic, and 1/150th of a grain of scopolamine, a drug which promotes dryness of the throat, on orders from Dr. Zeigler. At 5:40 p.m., sodium pentathol was given intravenously, to induce unconsciousness, and an airway was inserted in the patient's mouth. The anesthetic administered was a mixture of four parts of nitrous oxide and one part of oxygen. In order to relax the muscles of the throat and chest, the respondent administered two cubic centimeters of Tubocurare by intravenous infusion at 5:50 p.m., two more cubic centimeters at 6:20 p.m., one more at 6:25 p.m., and two more at 6:45 p.m.

At no time during the administration of the anesthetic until the occurrence of the cardiac arrest, did respondent "bag breathe" the patient, that is, squeeze the breathing bag rhythmically or otherwise in order to assist respiration.

## Evidence of Negligence

The first element of negligence produced by appellants

is the failure to bag breathe the patient. Appellants contend that this was imperative, chiefly because of the use of Tubo-curare, which weakens the force of breathing muscles, the administration of which had followed the depressant drugs, demerol and sodium pentathol; and that the supporting reasons for the necessity of bag breathing were the patient's elevated temperature which demanded more oxygen and the fact that the operation required lifting of the intestines against the diaphragm, which would put pressure on the respiratory process. Dr. Robert Dubois Leggett, a specialist in anesthesiology, testified that under the circumstances of the case, and particularly with reference to the use of Tubo-curare, there should have been manual bag breathing 90 per cent of the time until the Tubocurare had sufficiently worn off. This, he testified, would have kept the amount of gases moving in and out of the lungs at a high enough level to provide normal exchange of oxygen and carbon dioxide in the lungs. He testified that a cardiac arrest could be pre-cipitated by the failure to bag breathe, and that cessation or extreme diminution of the heart beat would be more likely, in absence of 90 per cent manipulation of the bag.

Dr. Alfred Amos Thurlow, Jr., a specialist in thoracic sur-gery, testified that in the Santa Rosa area, which includes Petaluma, the city in which the operation was performed, it is customary for the anesthetist to assist ventilation by squeez-ing the bag when Tubocurare is used.

Appellants point to another element of claimed negligence, either as an independent one or as simply subsidiary to the lack of bag breathing, namely, want of vigilance shown by, and possibly partly caused by, the omission of respondent to make a count and to record the count of the patient's pulse rate at any time. Dr. Zeigler testified that the single entry on the chart relating to the pulse rate as 124 beats per min-ute had been made preoperatively by a nurse (this had been the rate shortly after noon); that he found it to be in that vicinity; that he did not make specific counts of pulse rate, but could and did make an estimate of the rate as well as volume, quality and regularity. The actual rate may have been as low as 118, he testified.

Appellants also point to the fact that the blood pressure on the anesthesia record, as entered by a nurse, was 124 systolic over 70 diastolic (which seems to have been entered at the time the patient was admitted to the hospital at 12:43 p.m.), but that when respondent took the blood pressure at

the commencement of the operation at 5:30 p.m., the systolic was 110 and the diastolic, 55. Respondent admitted that the diastolic was slightly below normal. Appellants make the point that if the blood pressure showed such a wide variance from the time of entry to the time of commencement of the operation, the pulse rate, too, may have been shown to have been considerably lower had the doctor made an actual count, and they show that at 4 o'clock, an hour and a half before the operation, the pulse had dropped to 80.

Respondent did not know what the patient's temperature was, although he knew it was elevated. The chart showed the temperature to be 102.8, but this had been taken shortly after noon. Respondent did not find the temperature at the beginning of the operation. Indeed, he did not look at the figures on the chart as to preoperative condition of pulse, blood pressure, temperature or respiration until after the anesthetic was completed.

Appellants also show that shortly after noon the patient's respiration was 20, and this was the figure entered on the anesthesia record, but that there had been a change to a figure between 16 or 18 before the operation. Respondent thought the rate was within the vicinity of 20 again by 5:30.

Respondent conceded that he was not qualified to intubate a patient and, further, that a doctor who makes a sizeable part of his practice in giving of anesthetics should be qualified to handle intubation in case of emergency. Intubation is placing a tube through the vocal cords and into the trachea. Dr. Leggett testified that at the time of the thoracotomy an endotracheal tube is considered to be practically mandatory. Dr. Clegg, a general practitioner who gives anesthetics in the Sonoma County area, testified on cross-examination that a general practitioner in that area, giving anesthetics as a substantial portion of his practice in November 1960, would be obliged to be competent in intubation under the standard of practice and care existing in Petaluma.

In contradiction of the asserted negligence, respondent produced his own testimony, that of other physicians, and that of two nurses. Respondent testified that he kept respiration under constant surveillance by watching the movement of the breathing bag; that the bag was moving during the entire anesthesia until it stopped; that he noticed no change in the texture or color of the skin before or immediately after the bag stopped; that when Tubocurare is used there is danger to the respiration, which, however, is under control of the

ventilation bag and that if it is necessary that the patient be assisted, the bag is compressed; that he did not have to squeeze the bag in this case until the cardiac arrest occurred.

Dr. Roberts, the operating surgeon, testified that during the operation he saw no change in the color of the blood, although a record of Dr. Thurlow's, which was admitted in evidence, shows that Dr. Roberts told him that the blood was a little darker at one time. Dr. Roberts did not recall saying this to Dr. Thurlow. He testified that the heart was of normal color when he looked at it, but that change of color in tissue like heart muscle would occur more slowly than change of color in the blood, and that it is more difficult to tell the color of the heart when one is looking through the pericardium, as he did, than if the pericardium, the membrane surrounding the heart, had been open.

Dr. Robert Winston Churchill, an anesthesiologist, testified that under circumstances such as were present in this case, there would be no rule of care that would require bag breathing of the patient; that the dosages of Tubocurare were not unreasonable; that there is nothing in the record to show that there was an increase in blood pressure preceding the circulatory collapse and that an increase in pressure would have occurred from hypoxia; that the displacement of intestines would have been almost minimal; that lack of oxygen would cause a change in the color of the blood; and that if manipulation of a bag is done too forcefully, it can damage the lungs and interfere with the activity of the heart.

Dr. Harding Clegg, a general practitioner who gives anesthetics about four or five times a week, testified that the amounts of Tubocurare given were within standard limits; that the determination of bag breathing would depend on observations which are not recorded usually on the chart, namely, the color of the patient, of the fingernails and lips, shallow breathing, and elevation of blood pressure (which is recorded).

Dr. Vivian Fleming, a general practitioner who had given anesthetics about 1,500 times, testified that the Tubocurare dosage was standard; that the anesthetist can tell what the respiration is by looking at and feeling the breathing bag, and that most of the time you have your hand on the bag (there is no testimony that respondent felt the bag as a means of gauging respiration); that, based upon the chart, her opinion was that the standard of care in Petaluma did not require bag breathing; that if the patient is breathing nor-

mally and her color is good, she considers it meddlesome to squeeze the bag; that over-breathing the patient can cause trouble; that the chart looks normal and gives no indication of hypoxia; that one must take pulse counts, but not by watch; that the pulse rate must have been fairly steady or the blood pressure would not have been steady.

One of the two nurses who assisted at the operation testified that she would see respondent take the blood pressure and pulse, and that he would observe the patient's cheeks; that she herself could see the side of the patient's face, her neck and cheeks, and her hands and fingernails, and that she saw no change in color before the collapse; and that she saw no change in the color of the blood at the time the chest was opened. The other nurse testified that she noticed no change in the color of the blood or skin. Both of the nurses testified that they heard no announcement by Dr. Roberts to Dr. Zeigler of any change in the color of the blood.

### Rarity of Cardiac Arrest in Abdominal Surgery

Dr. Leggett, under cross-examination, testified as follows: "Q. Do you have any idea of the percentage of cardiac arrests that occur during abdominal surgery such as we have here? A. It is very low. Q. Well, would you give us an estimate? A. I would estimate about one in ten thousand. Q. One in ten thousand? A. Yes. Q. And I take it they can occur in spite of the best conditions and the best physicians and the best surgeons and the best facilities, is that correst? ... A. Yes; yes, but under these conditions they are very rare. Q. But they do happen? A. They do happen. The incidence would be much lower."

### Possible Causes Other Than Hypoxia of the Cardiac Arrest

Besides the testimony which respondent presented by way of contradicting asserted negligence in assisting respiration, respondent suggested or claimed that the cardiac arrest had other causes than hypoxia. The first was stimulation of the vagus nerve, which causes sudden stopping of the heart; but no attempt whatever was made to relate this possibility to the case except the asserted suddenness of the collapse. There is a statement by Dr. Thurlow that peritonitis would increase the chances of cardiac arrest. Anaphylactic shock was also suggested as a possible result of the one million units of penicillin which were administered in the area of the peri-

tonitis; but the only physician testifying about this, Dr. Thurlow, said that although penicillin shock can be found, it is very rare and that he does not feel that it was the cause of the cardiac arrest (patient had received penicillin before).

The main hypothesis of respondent is that embolism was the cause. Respondent testified that his first impression had been of an embolism, but that he had come to no "real definite conclusion" as to the cause. Dr. Roberts testified that it was his opinion that embolism was the cause; that embolism is a risk of abdominal surgery, and particularly pelvic surgery; that infection causes clotting of the blood vessels. He also testified that a clot may take years to form; that Mrs. Edelman had been kicked in the groin by a horse in 1957, with resultant ecchymosis, and that he had operated on her for varicose veins in 1959, and this could have something to do with a blood clot. On the other hand, Dr. Roberts testified that an electrocardiogram taken some hours after the operation was normal. He stated that whether an electrocardiogram would give evidence of an embolism would depend upon the degree of embolization. Chest X-rays following the operation were essentially negative.

Dr. Thurlow, who when called as a witness by the plaintiffs, had testified to the practice of bag breathing when Tubocurare is used, was interrogated on the subject of embolism by the defense, in the manner of direct examination, although technically under the heading of cross-examination. He was the physician who had been engaged by Dr. Roberts to take care of Mrs. Edelman when it was recognized that she had not recovered from the arrest. He testified that pulmonary embolus can occur during any operative procedure; and that an electrocardiogram on December 1, 1960, indicated a possible strain on the heart, which indicated possible pulmonary embolus. However, he said most of the time there would be evidence of pulmonary embolism on X-rays, and when confronted with the question whether, despite the possibility of embolism, it was a *probability* that the cardiac arrest was caused by hypoxia, he testified he would have to say yes to that.

Dr. Leggett testified that although incidence of cardiac arrest as a result of pulmonary embolus increases as you go down toward the extremities in the operation, in his experience embolisms during surgery occur when there is manipulation of the area in which the thrombus is situated. But the collapse occurred when the abdomen was closed and the skin was being sutured. The electrocardiogram showed some heart strain

which could have been caused by embolus or by recent thoracotomy. He testified that if there had been pulmonary embolism, blood pressure would not have been maintained, when restored, as it was in this case; that there would have been appreciable spitting up of blood on the day following; and that there would have been an X-ray finding at the site of the embolism. If there had been a smaller embolus than would show on X-rays, Dr. Leggett believed that the preexisting changes, because of inadequate breathing, would have increased the possibility of cardiac arrest.

### The Law of Res Ipsa Loquitur

The existence of the conditions upon which the operation of the doctrine of res ipsa loquitur is to be predicated is a question of fact and the right of the jury to find those facts must be carefully preserved. (*Seneris* v. *Haas*, 45 Cal.2d 811, 827 [291 P.2d 915, 53 A.L.R.2d 124].)

Whether the negligence is the most likely explanation of the injury is not a conclusion for the judge to draw, or refuse to draw, but for the jury, provided plaintiff has produced such evidence that reasonable men may differ as to the balance of probabilities. Inference of negligence need not be conclusive or compelling. It is enough that the court cannot say that reasonable men could not draw it. (*Seneris* v. *Haas, supra,* p. 827; *Wolfsmith* v. *Marsh,* 51 Cal.2d 832, 835-836 [337 P.2d 70, 82 A.L.R.2d 1257].)

In determining whether an injury probably was the result of negligence, the courts and juries may draw upon common knowledge and the testimony of expert witnesses, as well as the circumstances relating to the injury in each particular case. (*Wolfsmith* v. *Marsh, supra,* at p. 835.)

It is not contended by appellants that laymen have common knowledge of the cause of cardiac arrest. They do contend that the testimony of experts, as applied to the circumstances of the case, gave appellants the right to the instruction. The rarity of the cardiac arrest appears from the quoted testimony of Dr. Leggett. Rarity of the occurrence, however, does not in itself bring into operation the doctrine of res ipsa loquitur. (*Siverson* v. *Weber,* 57 Cal.2d 834 [22 Cal.Rptr. 337, 372 P.2d 97]; *Salgo* v. *Leland Stanford etc. Board of Trustees,* 154 Cal.App.2d 560 [317 P.2d 170].)

But in this case there are, in addition to the rarity of the occurrence, two kinds of evidence which, combined,

gave to appellants the right to the requested instruction. These elements are: (1) expert testimony from which reasonable persons might infer that negligence was the probable cause of the injury, and (2) specific acts (or omissions) of negligence.

1. *Probability*. The testimony of Dr. Leggett to the effect that although cardiac arrest in abdominal surgery is, in any event, extremely rare, one in ten thousand, the incidence is much lower with the best hospitals, doctors and conditions. Respondent was not bound to the highest and best of ability and care, of course. But the testimony shows a form of relationship between ability and care on the one hand, and incidence of cardiac arrest on the other. A reading of the record demonstrates that no attempt was made to show that occurrence of embolism is in any way related to a scale of ability and care; the testimony of Dr. Leggett, therefore, has to do with a relationship between ability and care to hypoxia, the cause contended for by appellants. In *Quintal v. Laurel Grove Hospital,* 62 Cal.2d 154 [41 Cal.Rptr. 577, 397 P.2d 161], testimony by an expert that 90 per cent of deaths occurring to patients under anesthesia from cardiac arrest were due to improper management of the airway, was an important element in supporting the court's conclusion that the res ipsa loquitur instruction should have been given (p. 164), even though the statement was somewhat faulty in its application to the case because it referred to deaths under anesthesia, including deaths other than those following cardiac arrests (pp. 171-172), and the term "improper management" of the airway rather than faulty or negligent management was used by the expert. What is required by way of expert testimony is not perfect matching of the doctor's testimony with the test established by law, but a statement sufficient to enable a reasonable man to draw the inference of probable negligence.

Dr. Thurlow also testified that hypoxia was the probable cause of the arrest. The testimony of Dr. Thurlow about probability was not tied to a specific act of negligence; it was a basis upon which a jury might find the probability of negligence. There was very little, if any, attempt on the part of respondent to show that if the cardiac arrest resulted from hypoxia, it was not caused by negligence; and, indeed, one of respondent's witnesses, Dr. Churchill, testified that if hypoxia were present, it would have produced a significant

increase in pulse rate and a rise in blood pressure which, it would seem, would have been detectable.

2. *Specific acts or omissions.* Respondent contends, as he did in the trial court, that appellants are not entitled to a res ipsa loquitur instruction because the expert testimony was not related to a general proposition of likelihood that cardiac arrest results from negligence, but related to a specific asserted negligent failure to bag breathe. We have stated above the general character of parts of the expert testimony relating to probability. The addition to these of specific facts does not weaken, but fortifies, the claim of plaintiffs to the res ipsa loquitur instruction. In *Cavero* v. *Franklin General Benevolent Society,* 36 Cal.2d 301 [223 P.2d 471], where death of a child occurred during anesthesia in performance of a tonsillectomy, res ipsa loquitur was held applicable where there was a combination of testimony as to rarity of the occurrence and testimony of a particular fault that the anesthetist gave too much ether to the child (p. 305). In *Siverson* v. *Weber, supra,* 57 Cal.2d 834, upon which respondent chiefly relies, it was held that rarity of the occurrence does not in itself show probable negligence (p. 839), but the court pointed out that no witness testified that anything was done during the operation that was contrary to good medical practice (p. 839), which, of course, is not so in the case before us. Finally, in *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, a combination of rarity and particular acts produced the court's conclusion that res ipsa loquitur instructions should have been given (p. 164). We recognize some differences between *Quintal* and the present case, but we find the cases to be similar in principle.

Respondent argues that appellants relied on a single claimed omission, failure to bag breathe; that appellants presented this proposition to the jury and failed; that having limited themselves to this single proposition, they cut themselves off from the right to res ipsa instructions. But the record does not show that appellants did so restrict themselves. They assert that the cardiac arrest resulted from failure to oxygenate the patient properly, and although they put forth failure to bag breathe as the principal fault, they also claim that inability to intubate, particularly when the crisis came, was a factor in causing or prolonging the arrest; and they contend that there was a lack of vigilance on the part of respondent, a claim which they deem supported by asserted failure to keep a proper chart. Considering the testimony of Dr. Leggett on

the rarity of the occurrence and on the implied relationship between it and negligence; considering that the operation is an extremely common one and not one in which a particular injury is an inherent hazard, as in *Siverson* (fistula following hysterectomy); and considering the more specific evidence produced by appellants, we hold that it was error to refuse a res ipsa loquitur instruction.

### *Prejudice*

In determining whether the refusal of the instruction was prejudicial, we note preliminarily that the trial judge, who did not have the benefit of the later decision of the *Quintal* case, cautioned counsel that the ruling was a close one and that there was a risk to the plaintiffs in proposing the instruction, and to the defense in opposing it. The defense determinedly resisted the instruction, showing realization of its importance. This, of course, does not deprive the defense of their present right to have it adjudged whether, in the light of the whole record, the ruling was prejudicial.

We believe it was prejudicial. Res ipsa loquitur would have permitted the jury to make a synthesis of all of the faults which appellants were able to charge against respondent. Disadvantaged as they were by the fact that the only persons in the operating room who observed the events were respondent and his witnesses, appellants can hardly be said to have suffered no prejudice when they were denied the right to the doctrine which the law provides, in appropriate cases, to offset their handicap. When res ipsa loquitur is appropriate, a plaintiff is entitled to have the probability of negligence, together with whatever other evidence he can accumulate, presented to the jury.

He is entitled to have the jury instructed that if the probability of negligence appears to the jury, the defendant will not be held blameless unless he shows a definite cause for the accident in which no element of negligence on his part inheres, or of such care in all possible respects as necessarily leads to the conclusion that the accident could not have happened from want of care but must have been due to some unpreventable cause, although the exact cause is unknown. (*Quintal* v. *Laurel Grove Hospital, supra,* at p. 169; *Davis* v. *Memorial Hospital,* 58 Cal.2d 815, 818, 819 [26 Cal.Rptr. 633, 376 P.2d 561].) Appellants were denied this helpful instruction and were left to the proof of negligence under the common instructions as to their burden of proof.

Appellants were also entitled to have the trial judge take the res ipsa loquitur doctrine into consideration in ruling on motion for new trial.

Judgment reversed.

Draper, P. J., and Salsman, J., concurred.

A petition for a rehearing was denied May 27, 1965, and respondent's petition for a hearing by the Supreme Court was denied June 23, 1965. Traynor, C. J., was of the opinion that the petition should be granted.