[Civ. No. 8970. Fourth Dist., Div. Two. Mar. 18, 1969.]

KENT FRASER, Plaintiff and Appellant, v. CHARLES P. SPRAGUE, Defendant and Respondent.

Albert A. Sanders, Margolis & McTernan and John T. McTernan for Plaintiff and Appellant.

Swing, Swing & Fisher and Everett H. Swing for Defendant and Respondent.

TAMURA, J.—Plaintiff appeals from a judgment of nonsuit in a medical malpractice action arising out of an operation performed by defendant on plaintiff for the removal of the lesser saphenous vein.[1]

The question is whether there was sufficient evidence to require the case to be submitted to the jury under a conditional res ipsa loquitur instruction.

██ A nonsuit may be granted " . . . '. . . only when, *disregarding conflicting evidence,* and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff.' [Citations]" (*Seneris* v. *Haas,* 45 Cal.2d 811, 821 [291 P.2d 915, 53 A.L.R.2d 124]; *Reuther* v. *Viall,* 62 Cal.2d 470, 474-475 [42 Cal.Rptr. 456, 398 P.2d 792]; *Kopfinger* v. *Grand Central Public Market,* 60 Cal.2d 852, 855 [37 Cal.Rptr. 65, 389 P.2d 529]; *Meyer* v. *Blackman,* 59 Cal.2d 668, 671 [31 Cal.Rptr. 36, 381 P.2d 916]; see *Quintal* v. *Laurel Grove Hospital,* 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161].) ██ Unless a verdict for plaintiff would be so lacking in evidentiary support that the trial court would be required to set it aside as a matter of law, it is not justified in taking the case from the jury. (*Seneris* v. *Haas, supra,* p.

---

[1]Defendant also removed the greater saphenous vein, which is located in the front of the leg, but that part of the operation produced no untoward result and is not involved in plaintiff's suit. The claim arises out of the removal of the lesser saphenous vein which is located at the back of the leg and extends upward from the ankle to the popliteal fossa, or space, located behind the knee joint.

821.) In reviewing a judgment of nonsuit the evidence must be viewed in the light of those settled rules. (*Kopfinger* v. *Grand Central Public Market, supra,* 60 Cal.2d 852; *Meyer* v. *Blackman, supra,* 59 Cal.2d 668; *Bedford* v. *Bosko,* 217 Cal. App.2d 346 [31 Cal.Rptr. 727]; *Bristow* v. *Brinson,* 212 Cal. App.2d 168, 172 [27 Cal.Rptr. 796].)

In 1963 plaintiff was suffering from varicose veins in his left leg. He consulted defendant who recommended removal of both the greater and lesser saphenous veins. Defendant described the surgical procedure as a simple operation requiring hospitalization for only four or five days and stated that plaintiff would be able to return to work in three or four weeks. Defendant did not indicate any risk of nerve injury or resultant pain other than the normal pain of surgery.

The surgery was performed on April 29, 1963. Plaintiff was under general anesthetic and was unconscious throughout the operation. Defendant employed a surgical instrument known as a Linton stripper, a length of moderately flexible stainless steel wire on each end of which is affixed a stainless steel tip shaped like an olive, the tip on one end being three times the size of the other. Defendant made one incision near the upper limits of the popliteal space, visualized, clamped and cut the lesser saphenous vein; inserted the stripper in the vein; threaded it down through to the lateral malleolus,[2] where he made a second incision; visualized, clamped and severed the vein; tied the vein to the stripper; and removed the vein by pulling out the instrument. Defendant was uncertain whether he pulled the stripper out through the popliteal incision or the malleolus incision. At trial he testified that it was through the malleolus incision, but at his depositon he testified that it was through the popliteal incision. Either method is medically acceptable but when the stripper is pulled through the popliteal space, the vein, which gathers in bunches at the head of the stripper, must be drawn through tissues in the vicinity of the common peroneal nerve. The common peroneal nerve is the motor and sensory nerve of the leg.

Following surgery defendant wrapped the leg with an ace elastic bandage from the ankle to the groin and left an order that the patient was to walk five minutes hourly. At 5 p.m. of the day of the operation defendant examined plaintiff and loosened and reapplied the bandage. Plaintiff had complained of numbness in the front of his leg. On two occasions while he

---

[2]The bony projection at the lower end of the fibula.

was taking the hourly walks plaintiff fell but suffered no injury.

On May 6, five days after plaintiff's discharge from the hospital, office tests performed by defendant revealed that plaintiff had difficulty in dorsiflexing his foot indicating nerve impairment of the leg. Defendant ordered physical therapy treatment to preserve muscle tone while the nerve was regenerated. Plaintiff underwent such treatment for eleven months; it involved three treatments a week and tapered off to twice a week during the later period. During one of the post-operative office visits, defendant noted that plaintiff had a partial foot drop which is characterized by a dropping and inward turn of the toes and a dropping or dragging of the toes in stepping forward when walking. Defendant determined that the condition was caused by a malfunction of the superficial peroneal nerve and prescribed a foot brace to hold the foot in proper position when walking. Plaintiff wore the brace until two months after defendant discharged him. In September and November 1963 defendant caused electromyographic studies to be made of plaintiff's leg. From those studies he concluded that plaintiff was suffering from an impairment of the common peroneal nerve. Defendant provided post-operative care for more than one year.

Plaintiff was not charged for the extended post-operative care, the physical therapy treatments or the electromyograms. The items mentioned are not normally incident to post-operative care following vein stripping.

After defendant discharged him plaintiff continued to suffer pain in his left foot. He consulted Dr. Carton, a neurosurgeon, and Dr. Massell, an expert in vascular surgery, both of whom, after performing tests, concluded that plaintiff was suffering from causalgia, a condition which frequently follows a nerve injury and is evidenced by the patient's complaint of burning pain, extreme sensitivity to superficial touch, and bizarre distortion of sensation. In the opinion of the two doctors, injury to the common peroneal nerve was the cause of the causalgia. As the result of their findings, Dr. Massell performed a lumbar sympathectomy on July 19, 1967, to relieve the condition.

Dr. Massell, also testified in substance as follows: The common peroneal nerve traverses the popliteal space. As the lesser saphenous vein approaches the popliteal space from below, it is superficial to the skin's surface but, as it enters the area of the popliteal space, it dips into the tissues where it joins the

peroneal nerve. In most cases, at the point where defendant made the incision the lesser saphenous vein could be as deep or deeper than the common peroneal nerve. At certain points the nerve and the lesser saphenous vein are about one centimeter apart; in some cases the two are so close together that it is necessary to move the nerve to reach the lesser saphenous vein. In the surgical procedure for the operation, one or more retractors would be used at the incision at the popliteal space in order to get to the junction of the lesser saphenous vein and the peroneal nerve. In using retractors, care must be exercised to avoid exerting pressure against the nerve. In his opinion, with an incision of ½ to 1 inch as was made in the instant case, it would be difficult to get at the underlying structure and "vigorous use" of retractors would be required. While there are some risks of nerve injury in vein stripping, there are recognized techniques for its avoidance. In his experience in performing approximately 1,000 surgical removals of the lesser saphenous vein, he never encountered any impairment of the common peroneal nerve and, in fact, he never heard of such a result stemming from the operation.

Dr. Carton was also of the opinion that plaintiff suffered an injury to the common peroneal nerve at the popliteal area. He testified that if surgery were performed "with the usual care," the injury would be unlikely, though possible; that in his opinion it would have been unlikely for the injury to have occurred during the surgery and that overtight bandaging following surgery was the more probable cause of the injury. In reaching his opinion, he considered a nurse's entry for April 30, the day following surgery, which read: "Complained of numbness in foot and ankle. Color good, foot warm. Ace bandage loosened. No further complaint."

Defendant was called under section 776 of the Evidence Code and testified in substance as follows: After examining reports of the electromyograms he had ordered, he concluded that the common peroneal nerve had been injured. He had "no positive concept" of the cause of the nerve impairment but "had probable ideas or opinions as to what it might be" including "bruising" in the course of surgery resulting from the mass of veinous tissue accumulated on the stripper. He admitted that bruising of the nerve during surgery could be avoided by the observance of "proper surgical procedures."[3]

---

[3]Defendant testified as follows:

"Q. [Mr. McTernan, plaintiff's counsel]: Now, you also reached an opinion, did you not, doctor, as to the nature of the damage to the nerve?

Prior to surgery plaintiff had been employed as a salesman. Following the operation he was unable to work until May 1964. He left his employment in July 1966 for the lumbar sympathectomy and was released by his doctor to return to work in December 1966 but his former employer refused to take him back.

If the evidence summarized was sufficient to bring the doctrine of res ipsa loquitur into play, the nonsuit should have been denied. (*Seneris* v. *Haas*, *supra*, 45 Cal.2d 811, 827.)
 It is not for the trial court to draw or to refuse to draw the inference of negligence so long as plaintiff has produced sufficient evidence to permit the jury to make that decision. (*Wolfsmith* v. *Marsh*, 51 Cal.2d 832, 835-836 [337 P.2d 70].)
 The doctrine of res ipsa loquitur is fundamentally a doctrine predicated upon inference deducible from circumstantial evidence. (*Clark* v. *Gibbons*, 66 Cal.2d 399, 400 [58 Cal.Rptr. 125, 426 P.2d 525]; *Seeley* v. *Combs*, 65 Cal.2d 127, 130 [52 Cal.Rptr. 578, 416 P.2d 810].) ''The conditions requisite for the application of the doctrine of res ipsa

---

''A. [Dr. Sprague]: I had no positive concept of what had caused the impairment. I had probable ideas or opinions as to what it might be.

''Q. All right. And they included that it might be a result of mechanical scraping, isn't that so?

''A. Bruising is the term I used.

''Q. In the course of surgery?

''A. Yes.

''Q. And did you not reach the opinion that the most probable cause of this nerve damage was some physical reaction on the surface of the nerve that produced a swelling that interfered with the blood supply to the nerve?

''A. This was another possibility.

''Q. And that it was also probable that there might have been a contusion or bruise to the nerve resulting from the mass of veinous tissue accumulated on the stripper?

''A. That is correct.

''Q. And you knew, did you not, that Mr. Fraser had a large and tortuous vein which produced a ruffled mass on the stripper?

''A. That is correct.

''Q. You did know about the fact that the vein was large and tortuous before the surgery was performed, did you not?

''A. Yes, sir.

''Q. That was based on your examination and findings of April 11, 1963?

''A. That is right.

''Q. And your opinion that it was probable that the nerve problem resulted from a physical reaction on the surface of the nerve was based, in part, on the slow onset of the nerve impairment, isn't that so?

''A. That is correct.

''Q. Doctor, a bruise or contusion of the common peroneal nerve in the course of the surgery you performed is an avoidable result by the observance of proper surgical precautions, isn't that so?

''A. Yes, sir.''

loquitur are: (a) the accident [or injury] must be of a kind which ordinarily does not occur in the absence of someone's negligence; (b) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (c) it must not have been due to any voluntary action or contribution on the part of the plaintiff.'' (*Wolfsmith* v. *Marsh, supra,* 51 Cal.2d 832, 835; *Seneris* v. *Haas, supra,* 45 Cal.2d 811, 823; *Ybarra* v. *Spangard,* 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258]. See *Meier* v. *Ross General Hospital,* 69 Cal.2d 420, 427 [71 Cal.Rptr. 903, 445 P.2d 519], and *Vistica* v. *Presbyterian Hospital,* 67 Cal.2d 465, 468-469 [62 Cal.Rptr. 577, 432 P.2d 193], for a qualification respecting the third element.)

■ '' 'As a general rule, res ipsa loquitur applies where the occurrence of the injury is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both on common knowledge, and on expert testimony.' '' (*Tomei* v. *Henning,* 67 Cal.2d 319, 322 [62 Cal.Rptr. 9, 431 P.2d 633] ; *Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 408; *Davis* v. *Memorial Hospital,* 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561] ; *Siverson* v. *Weber,* 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97].)

■ ''Since the [doctrine] . . . permits the jury to infer negligence from the happening of the accident alone, there must be a basis either in common experience or expert testimony that when such an accident occurs, it is more probably than not the result of negligence.'' (*Tomei* v. *Henning, supra,* p. 322; see *Meier* v. *Ross General Hospital, supra,* 69 Cal.2d 420, 428-429.)

■ Although there are situations where a layman, without expert testimony, may infer as a matter of common knowledge that the injury would not have occurred unless someone were negligent (*Meier* v. *Ross General Hospital, supra,* 69 Cal.2d 420, 429; *Davis* v. *Memorial Hospital, supra,* 58 Cal.2d 815, 817; *Leonard* v. *Watsonville Community Hospital,* 47 Cal.2d 509 [305 P.2d 36]), ordinarily plaintiff must produce some expert testimony which would support an inference of negligence from the fact of the accident itself.

■ Evidence that an accident rarely occurs when due care is exercised does not without more, justify an inference of

negligence. (*Siverson* v. *Weber, supra,* 57 Cal.2d 834, 839.) To permit an inference of negligence to be drawn solely upon such evidence would place an undue burden on the medical profession and would discourage new procedures which may involve inherent risks even when due care is used (*Siverson* v. *Weber, supra,* p. 839.). But evidence of rarity, together with some other evidence indicating negligence, may warrant a conditional res ipsa instruction, particularly if the injury resulted from a commonplace procedure rather than from a complex or unusual operation. (*Clark* v. *Gibbon, supra,* 66 Cal.2d 399, 412-413; *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, 165-166; *Cho* v. *Kempler,* 177 Cal.App.2d 342, 351 [2 Cal.Rptr. 167, 76 A.L.R.2d 774]. See *Meier* v. *Ross General Hospital,* 69 Cal.2d 420, 429 (fn. 4).)

■ In the case under review there was substantial evidence that plaintiff suffered an injury to the peroneal nerve and that such injury occurred during surgery or, according to the testimony of Dr. Carton, as a result of overtight bandaging following surgery. Rarity of such an accident was established by Dr. Massell's testimony that he had performed at least 1,000 such operations without injury to the peroneal nerve and, in fact, had never heard of such an injury resulting from like operations. The evidence of extreme rarity accompanied by the following additional evidence was sufficient to entitle plaintiff to have the cause submitted to the jury under a conditional res ipsa instruction: The operation was relatively commonplace rather than complex or unusual; at the time he recommended surgery, defendant made no mention of risk of nerve injury; there was expert testimony that the injury would have been unlikely had the operation been performed with due care; there was expert testimony that the size of the incision made by defendant would have required "vigorous" use of retractors in the proximity of the injured nerve; there was expert testimony that overtight bandaging was the probable cause of the injury; defendant admitted that it was probable that the peroneal nerve was bruised during surgery and that bruising in the course of the surgical procedure in question is avoidable by observing "proper surgical precautions"; and plaintiff was furnished extended postoperative care and physical therapy treatments without charge. The foregoing evidence was sufficient to permit the jury to have drawn an inference of negligence from the fact of the accident.

Defendant contends that expert testimony, including that of the defendant, that nerve injury can be avoided by "proper surgical precautions" was insufficient to show probability of negligence because the "proper surgical precautions" were never described and there was no evidence that defendant had failed to take "proper surgical precautions." The contention is without merit. ▮ Expert testimony relied upon to establish probability of negligence "need not be in any particular language. It need only afford reasonable support for an inference of negligence from the happening of the accident alone." (*Tomei* v. *Henning, supra,* 67 Cal.2d 319, 322-323.)

▮ Evidence necessary to form the basis for the application of the res ipsa loquitur doctrine need not establish the fact that the actual procedure followed by defendant was negligent; it is sufficient if it supports an inference of negligence from the fact that the injury occurred. The inference of negligence which the doctrine permits to be drawn is one which stems from the happening of the accident itself as distinguished from an inference of negligence drawn from evidence of specific procedures followed by the surgeon. (*Tomei* v. *Henning, supra,* 67 Cal.2d 319, 323.) ▮ One of the theoretical bases for the res ipsa loquitur doctrine in medical malpractice is the doctor's superior, if not exclusive, knowledge of the facts and circumstances surrounding the accident. "There does not have to be an eyewitness, nor need there be direct evidence of defendant's conduct. There is no absolute requirement that the plaintiff explain how the accident happened. Res ipsa loquitur may apply where the cause of the injury is a mystery, if there is a reasonable and logical inference that defendant was negligent, and that such negligence caused the injury. (Prosser on Torts, *supra,* at 204.)" (*Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 409; *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, 165.)

▮ Defendant's contention that one of the essential elements of res ipsa loquitur, that the accident must be caused by an agency or instrumentality under the exclusive control of defendant, was not established, is likewise without substance. There was substantial evidence that in all probability the injury occurred during surgery. The evidence is undisputed that the surgical procedure was under defendant's control and supervision. The plaintiff having met the requirements for the application of res ipsa loquitur, the burden of explanation rested with the defendant. If it is defendant's position that someone else caused the injury, the burden of

coming forward with such evidence rested with defendant. (*Seneris* v. *Haas, supra,* 45 Cal.2d 811, 826; *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 494.)

Judgment reversed.

Kerrigan, Acting P. J., and Fogg, J. pro tem.,* concurred.

*Assigned by the Chairman of the Judicial Council.