[Civ. No. 27403. Fourth Dist., Div. Two. Dec. 1, 1982.]

JONI HALE, Plaintiff and Appellant, v.
RALPH J. VENUTO, Defendant and Respondent.

914

**COUNSEL**

Paul J. Gergen for Plaintiff and Appellant.

Bonne, Jones, Bridges, Mueller & O'Keefe and Mark V. Franzen for Defendant and Respondent.

**OPINION**

**TROTTER, J.**—Plaintiff appeals from a judgment of nonsuit in a medical malpractice action arising out of surgery performed by defendant on plaintiff.

FACTS

Plaintiff, Joni Hale, had a history of her left knee slipping out of joint since 1968. Her care was ultimately taken over by defendant, Dr. Ralph J. Venuto, an orthopedic surgeon who recommended corrective surgery after plaintiff suf-

fered a major dislocation of the left kneecap in July of 1975. As a result of this surgery, plaintiff suffers from combined peroneal and tibial palsy of her left foot, a condition evidenced by numbness in her big toe and three adjoining toes, the numbness extending about half way up her foot on both the top and the bottom.

There is conflicting evidence as to the type of warning defendant gave plaintiff prior to surgery in regard to postoperative complications. Both plaintiff and defendant testified that plaintiff was advised that she might still experience postsurgical knee problems, including inability to walk altogether. Defendant, however, disputes plaintiff's testimony that she was not specifically warned about possible postsurgical numbness to either her left leg or foot.

The surgery was performed July 31, 1975. Plaintiff was placed under general anesthetic and remained unconscious throughout the operation. The defendant performed a "Modified Hauser" surgical procedure which has the effect of realigning the entire mechanism controlling the kneecap in order to correct the attendant knee dislocation. During the operation a pneumatic tourniquet was applied to plaintiff's leg for the purpose of facilitating the operation procedure by cutting off the blood supply to the leg to create a dry (bloodless) surgical field. Following surgery plaintiff's leg was wrapped with a padded dressing consisting of expandable bandage extending from the toes to the groin. The defendant doctor was scheduled to take a few days vacation after the operation, but he nevertheless checked the plaintiff in the recovery room within one hour of the surgery. He also wrote detailed orders to be followed in the care of plaintiff during his absence.

Plaintiff testified that she first awakened around dinner time on the day surgery was performed, but that she did not regain full consciousness until the following morning. At that time she became aware of a throbbing pain in her left leg which was concentrated on the knee and foot. Plaintiff recalls first complaining about the pain to the hospital nurses the morning after surgery. Nothing was done about the pain, however, until she was checked by Dr. Rodman, defendant's associate, on the second or third postoperative day. (The hospital records show that Dr. Rodman actually·visited plaintiff the morning following surgery and noted that plaintiff was suffering "vague paresthesia" or tingling "without sensory loss." He also noted "no dorsa flexion," or inability to flex or raise foot up.) Following Dr. Rodman's visit, plaintiff's bandages were cut off in the foot area which gave plaintiff some relief and after which she experienced a tingling sensation throughout the whole foot.

Electromyogram tests performed on plaintiff subsequent to surgery indicated involvement of both the peroneal and tibial nerves which control the upward and downward motion of the foot. The defendant rendered followup care after

surgery for about one year and during this time period plaintiff's complaints of pain and numbness in her left foot continued.

Dr. David A. Johnson, a neurologist, examined plaintiff on behalf of defendant before the trial. He testified that his examination revealed some numbness of plaintiff's left foot and found "loss to pinprick and cotton" over the top and bottom of the foot more on the medial than the lateral side involving all the toes except the little toe. He attributed this condition to an apparent "combined lesion involving both a portion of the posterior tibial and peroneal nerves." He further testified that causation would vary from individual to individual but that foot numbness could be created by compression of a nerve, producing a lack of blood flow, resulting in injury to the nerve. He also stated that in the course of leg surgery nerve damage can result from "compartment syndrome" or internal bleeding inside either the anterior (front) or posterior (back) leg compartments. However it was his opinion that plaintiff's injury could not be explained by the occurrence of a "compartment syndrome" because that would only explain the peroneal component and would not explain the posterior tibial component in the back of the leg. Dr. Johnson did not believe that the surgical incision made in performing the modified Hauser procedure could have caused the problem because the incision is made "anteriorly and far away from where the nerves are." He also was of the opinion that plaintiff's foot numbness was a permanent injury.

Plaintiff also called to testify Dr. Richard G. Lambert, a board certified orthopedic surgeon, who had performed literally thousands of knee surgeries in his medical career. Dr. Lambert was of the opinion that the risk of combined peroneal or tibial palsy following the performance of a Hauser procedure was statistically nonexistent.

After reviewing the medical records, Dr. Lambert noted that exploration of the nerve was never done and that no definitive diagnosis as to plaintiff's condition was ever made. He concluded that the most probable cause of plaintiff's injury was external pressure either from the tourniquet used during surgery or from the application of tight bandages after the operation. He considered the probability of nerve damage during the actual surgical procedure to be small because the surgical knife "isn't long enough to reach over and cut that nerve." Lastly, he was of the opinion that a compartment syndrome could not have caused the injury.

As to the use of a tourniquet preparatory to knee surgery, Dr. Lambert testified that this was standard procedure and that although the surgeon rarely applies the tourniquet himself, the surgeon is responsible for the tourniquet because he "causes it to be put on and causes it to be removed." He also noted that from his experience tourniquet pressure ordinarily does not result in

damage to the peroneal and tibial nerves unless "it is incorrectly applied or it is applied over a bony prominence or the tourniquet itself is defective." As to improper bandaging, Dr. Lambert noted that the danger is in causing constriction in a given portion of the leg "as in the case of the peroneal nerve which lies directly over the bone of the fibula," since in his opinion "it doesn't take very much pressure in a certain specified area to cause damage to the nerve."

The defendant himself testified that "the surgeon controls the tourniquet pressure by looking at the wound" so that the surgeon can direct any needed adjustments in the pressure gauge to be made by the anesthesiologist. With respect to the application of the bandages, there was evidence that defendant visited plaintiff in the recovery room less than an hour after surgery and during this visit defendant remained "long enough to check [plaintiff] and make sure she was okay." He wrote orders to be followed in the postoperative care of plaintiff during his absence, including: "Do not remove Joni's dressing."

Dr. Lambert stated that while nothing in the record indicated that defendant did anything wrong during the surgery, he was of the opinion defendant was "below the usual and customary standard of care" as such result "does not generally occur without some untoward action of the surgeon."

### DISCUSSION

The issue before the court is whether there was sufficient evidence to require the case to be submitted to the jury under a conditional res ipsa loquitur instruction.[1]

The rules applicable to appellate review from nonsuits are well settled. A motion for nonsuit may properly be granted " " "... when, and only when, *disregarding conflicting evidence,* and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff." [Citations.]' " (*Seneris* v. *Haas* (1955) 45 Cal.2d 811, 821 [291 P.2d 915, 53 A.L.R.2d 124]; *Fraser* v. *Sprague* (1969) 270 Cal.App.2d 736, 739 [76 Cal.Rptr. 37]; *Kopfinger* v. *Grand Central Pub. Market* (1964) 60 Cal.2d 852, 855 [37 Cal.Rptr. 65, 389 P.2d 529].) Unless a verdict for plaintiff would be so lacking in evidentiary support that the trial court would be required to set it aside as a matter of law, it is not justified in taking the case from the jury. (*Seneris* v. *Haas, supra,* p. 821.)

[1]Appellant alternatively raises the issue of whether the lower court committed reversible error by denying plaintiff's motion to reopen plaintiff's case for the presentation of further evidence. Since we hold that the judgment of nonsuit should be reversed, we do not address this issue as plaintiff will have the opportunity to present any necessary additional evidence at the time of the new trial.

■ If the evidence summarized above was sufficient to bring the doctrine of res ipsa loquitur into play, the nonsuit should have been denied. It is not for the trial court to draw or to refuse to draw the inference of negligence so long as plaintiff has produced sufficient evidence to permit the jury to make that decision. (*Wolfsmith* v. *Marsh* (1959) 51 Cal.2d 832, 835-836 [337 P.2d 70]; *Seneris* v. *Haas, supra,* 45 Cal.2d 811, 827.)

■ The doctrine of res ipsa loquitur is fundamentally a doctrine predicated upon inference deducible from circumstantial evidence. (*Clark* v. *Gibbons* (1967) 66 Cal.2d 399, 409 [58 Cal.Rptr. 125, 426 P.2d 525]; *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 163 [41 Cal.Rptr. 577, 397 P.2d 161].) ■ The doctrine of res ipsa loquitur is applicable when three conditions are met: " '(1) the accident [or injury] must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' " (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258]; *Wolfsmith* v. *Marsh, supra,* 51 Cal.2d 832, 835; *Seneris* v. *Haas, supra,* 45 Cal.2d 811, 823.)

■ "As a general rule, res ipsa loquitur applies where the occurrence of the injury is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both on common knowledge and on expert testimony." (*Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 408; *Tomei* v. *Henning* (1967) 67 Cal.2d 319, 322 [62 Cal.Rptr. 9, 431 P.2d 633]; *Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561]; *Siverson* v. *Weber* (1962) 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97].) ■ "Since the [doctrine] . . . permits the jury to infer negligence from the happening of the accident alone, there must be a basis either in common experience or expert testimony that when such an accident occurs, it is more probably than not the result of negligence." (*Tomei* v. *Henning, supra,* p. 322.) Although there are situations where a layman, without expert testimony, may infer as a matter of common knowledge that the injury would not have occurred unless someone were negligent, ordinarily plaintiff must produce some expert testimony which would support an inference of negligence from the fact of the accident itself. (*Fraser* v. *Sprague, supra,* 270 Cal.App.2d 736, 744.)

■ The fact that a particular injury rarely occurs does not in itself justify an inference of negligence. (*Siverson* v. *Weber, supra,* 57 Cal.2d 834, 839.) To allow an inference of negligence to be made solely based on this fact would place a disproportionate burden on the medical profession and would dis-

courage the use of new procedures which may involve inherent risks even when due care is used. (*Siverson* v. *Weber, supra,* p. 839.) But evidence of rarity, together with some other evidence indicating negligence, may warrant a conditional res ipsa instruction, particularly where the injury resulted from a commonplace procedure rather than from a complex or unusual operation. (*Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 412-413; *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, 165-166.)

■ A review of the evidence in the case before us in the light most favorable to the plaintiff reveals that plaintiff suffered a combined injury to the peroneal and tibial nerves as a result of external compression during or as the result of a common surgical procedure and the risk of such injury following such procedure was "statistically nonexistent." A qualified medical expert (Dr. Lambert) was of the opinion that defendant's conduct was "below the usual and customary standard of care" and that such result "does not generally occur without some untoward action of the surgeon." There was sufficient evidence to allow the case to go to the jury with a conditional res ipsa loquitur instruction.

Defendant's argument that Dr. Lambert's opinion was without basis because the expert was not able upon reviewing the medical records to point to any particular act improperly done by the defendant is without merit. ■ Expert testimony relied upon to establish probability of negligence "need not be in any particular language. It need only afford reasonable support for an inference of negligence from the happening of the accident alone." (*Tomei* v. *Henning, supra,* 67 Cal.2d 319, 322-323.) Evidence necessary to form the basis for the application of the res ipsa loquitur doctrine need not establish the actual negligent procedures followed by defendant; it is sufficient if it supports an inference of negligence from the fact that the injury occurred. The inference of negligence which the doctrine permits to be drawn is one which stems from the happening of the accident itself as distinguished from an inference of negligence drawn from evidence of specific acts of wrongdoing on the part of the surgeon. (*Fraser* v. *Sprague, supra,* 270 Cal.App.2d 736, 746.) ■ An important factor to be considered in the application of the res ipsa doctrine in medical malpractice cases is the doctor's superior, if not exclusive, knowledge of the facts and circumstances surrounding the accident since " 'the chief evidence of the true cause, whether culpable or innocent, is practically accessible to [the doctor] but inaccessible to the injured person.' (9 Wigmore, Evidence [3d ed.], § 2509, p. 382.) [Citations.]" (*Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 489-490.) ■ " 'There does not have to be an eyewitness, nor need there be direct evidence of defendant's conduct. There is no absolute requirement that the plaintiff explain how the accident happened. Res ipsa loquitur may apply where the cause of the injury is a mystery, if there is a

reasonable and logical inference that defendant was negligent, and that such negligence caused the injury.' (Prosser on Torts (2d ed. 1955) § 42, p. 204.)'' (*Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 409; *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, 165.)

■ There was expert testimony that the most probable cause of plaintiff's injury was external nerve compression either from the tourniquet used during surgery or from the application of tight bandages after the operation and the doctrine of res ipsa loquitur does not require plaintiff to specifically identify which instrumentality was the most probable cause of her injury. As stated in *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 492-493: "It should be enough that the plaintiff can show an injury resulting from an external force applied while [s]he lay unconscious in the hospital; this is as clear a case of identification of the instrumentality as the plaintiff may ever be able to make.''

Defendant's further argument that one of the essential elements of res ipsa loquitur, that the accident must be caused by an agency or instrumentality under the exclusive control of defendant, was not established is likewise without substance. ■ The concept of "exclusive control'' does not have a narrow meaning. As stated in *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 493: "An examination of the recent cases, particularly in this state, discloses that the test of actual exclusive control of an instrumentality has not been strictly followed, but exceptions have been recognized where the purpose of the doctrine of res ipsa loquitur would otherwise be defeated. Thus, the test has become one of right of control rather than actual control.'' Moreover, the requirement of control is not an absolute one. Although "the doctrine will not ordinarily apply if it is equally probable that the negligence was that of someone other than the defendant, the plaintiff need not exclude all other persons who might possibly have been responsible where the defendant's negligence appears to be the more probable explanation of the accident.'' (*Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 443-444 [247 P.2d 344].)

■ The fact that the plaintiff in the present case was also under the care, custody, and control of the hospital, nurses, anesthesiologists and other medical practitioners as well as defendant, does not affect the application of the doctrine of res ipsa to defendant alone. "Every defendant in whose custody the plaintiff was placed for any period was bound to exercise ordinary care to see that no unnecessary harm came to him and each would be liable for failure in this regard.'' (*Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 491-492.) The plaintiff was under the control of defendant for a period of time and it is a question of fact for the jury to determine whether during that period of time the injury in question occurred.

Judgment reversed.

Kaufman, Acting P. J., and McDaniel, J., concurred.